Georgia Railroad and Banking Company *vs.* Garr.

---

GEORGIA RAILROAD AND BANKING COMPANY, plaintiff in error, *vs.* FANNIE V. GARR, defendant in error.

1. The right to sue for the homicide of the husband vests in the widow at the death of her husband, and is not divested by the subsequent marriage of the widow.

2. The subsequent marriage of the widow will not change the measure of damages to which she was entitled when her right of action accrued.

3. The evidence being conflicting, and there being evidence sufficient to support the verdict, and the presiding judge being satisfied therewith, this court will not interfere, especially after three successive verdicts for the plaintiff.

Damages.   Husband and wife.   New trial.   Before Judge BARTLETT.   Greene Superior Court.   September Term, 1875.

Reported in the opinion.

J. A. BILLUPS, for plaintiff in error.

REESE & REESE; M. W. LEWIS & SON; C. HEARD, for defendant.

JACKSON, Judge.

This was a suit instituted by Fannie V. Garr, when she was Fannie V. Oakes, against the railroad company, for damages for the homicide of her husband. He was an engineer upon the road, and was killed at Union Point, in Greene county. Under the charge of the court, the jury found for the plaintiff something over $7,000 00. The company moved for a new trial on various grounds set forth in the motion, the presiding judge declined to grant it, and the company brought the case before us, assigning three grounds of error: First. That Mrs. Oakes had intermarried with another man, and was no longer Oakes' widow, and had thus lost her right to recover for his homicide. Second. That if she could recover at all, she could only recover a support, such as he was wont to furnish her, during the four years of her widowhood; and, thirdly, that the verdict was decidedly and strongly against the weight of the testimony, and that the presiding judge should have granted the new trial on this ground.

1. That the widow of Oakes had the right to sue when the suit was commenced is not disputed. The question first made is, did she lose it by her marriage? Suppose that she had inherited a fortune after the beginning of this suit, so that she would no longer have needed to recover the support, or the value of it, of her deceased husband, would she have lost this right of action? Clearly not. If not, does she lose it by marrying another man who now supports her, or ought to do so? If so, she does not lose it by not needing it, but by marrying. Can that be so? We think not. The policy of the law is to encourage marriage; this young widow waited some four years, and then, in no hot haste, but decently, and after a long widowhood, comparatively, married again; ought she to lose a right of action which had vested in her by this second marriage? Not if the policy of the law be to encour-

Georgia Railroad and Banking Company *vs*. Garr.

age marriage: See Code, section 1697. But if this right vested in her, how else could it get out of her but by the marriage? And if the policy be to encourage marriage, the courts will construe the law, if two constructions can reasonably be put upon it, so as to harmonize with the general policy of the state. Section 2971 of the Code, then, will be so construed as to harmonize with the policy of the state, if practicable. It reads: "A widow, and if no widow, a child or children, may recover for the homicide of the husband or parent," and then it gives the right of survivorship to the children, if the widow dies, and to the remaining children if some of them die. If the legislature had intended the right of action ever to abate, we think they would have said so. If they had intended the widow to lose her right and it to go to the children in case of her marriage, how easy to have said not only that if the widow die the right shall survive to the children, but if she marry again! We hardly think that such an amendment could have passed the legislature. It would have been against their declared policy to encourage marriage, and would have been voted down, we think. At all events, they have not so enacted, and we think that her right remains intact though she should marry. Besides, she is still a mother. She must take care of the child which the record shows her deceased husband left her; the law does not provide that this child, as long as she lives, can ever get a dollar from the company. The child, in the lifetime of the mother, can get at the company for the homicide of the father only through the mother. The child will get at the company in that way, for the second marriage does not extinguish the maternal affection. It could not have been the intention of the legislature that a case should arise in which neither mother nor child should recover on a clear case made, yet such would be the case if the mother lost her right to sue by her second marriage. The statute now makes her property her own; the second husband has no marital rights; and in respect to this recovery she will be, to all intents and purposes, a *feme sole*, a widow still, free from all control of her husband, ex-

cept, indeed, what affection may prompt. In view of the whole case, we think the statute does not take away her right by marriage again, but it remains in her. The word widow indicates the person, not the state, and is used as synonymous with wife. That was the word used in the act of 1856 from which the Code was taken, and the words are used synonymously, or signifying the same thing, all over the Code.

2. In respect to the measure of damages, we think she also loses nothing for the same reasons. She and the child ought to have the full recovery; if she cannot get it all, the child can get none. Besides, what does it matter with the company to whom it goes, if they owe it. To cut off her right to this support would be to prove that her second husband was equal to the first as a provider, and would lead to inextricable confusion. Besides, this first husband would have been living and providing for her but for the act of the road; and if she has been so fortunate as to get another good man, the road necessitated her doing so by killing the first husband.

3. In respect to the finding being against the evidence, we have but to say that the evidence is conflicting, and that there is enough to sustain the verdict. The question fought was the negligence of the deceased, and that turned upon the speed at which he was running the cars when they reached the switch—whether it was at a rate greater than four miles an hour. Four witnesses swore that it was not at a greater rate; others that it was; the conductor that it was some four and a half miles an hour. If, in the judgment of deceased, he was only running four miles an hour, he was not negligent. Nobody can calculate exactly the rate to run, and it is hard to say a train is running exactly four or five miles per hour, or to engineer it exactly to that rate or this. So of the amount of the verdict. The evidence, we think, averaging it, and allowing interest to be added as part of the damages, may sustain it. There have been three successive verdicts for the plaintiff; and while we will not say that had we been in the jury box we would have rendered either of them, yet the whole policy of the law makes juries the judges of the facts

of every case, the judges of the credibility of the witnesses, whom to believe and whom to disregard, and when they have uniformly, for three times, thirty-six men of the vicinage in all, passed upon the facts and found the same way, we do not feel at liberty to interfere.

The charge was all that the railroad company could ask; the presiding judge who gave it has approved the finding, and litigation would be endless if, in such a case, we should overthrow the settled rulings of this court, and control his discretion. We must, therefore, affirm the judgment.

Judgment affirmed.