WILLIAM B. KELLER, Appellant, *v.* CHARLES D. HALSEY
et al., Respondents.

**Trial — erroneous direction of verdict — when evidence presents question for the jury.**

The evidence reviewed, in an action to recover from a firm of stockbrokers the damages for a wrongful and unauthorized sale of stocks, purchased by them for the plaintiff upon a margin; and *held*, that the facts present a question for the jury, and that it was error to direct a verdict for the defendant.

*Keller* v. *Halsey*, 136 App. Div. 940, reversed.

(Argued May 1, 1911; decided June 6, 1911.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered February 10, 1910, affirming a judgment in favor of defendants entered upon a verdict directed by the court.

The plaintiff alleged in his complaint that on the third and fourth days of October, 1904, the defendants, acting as his brokers and pursuant to his orders, purchased for him 3,000 shares of the preferred stock of the United States Steel Corporation; that he paid them $2,250 on account and they agreed to advance such further sums as were needed to complete the purchase and carry said shares for him until he gave directions to sell; that on the fourth, fifth and tenth days of October, without authority from him and without giving him notice of the time, place and manner, they wrongfully sold said shares of stock and converted them to their own use to his damage in the sum of $112,712.50.

The defendants by their answer admitted the purchase, but alleged that they reserved the right to close the transaction when the margin was exhausted without further notice; that the margin of the plaintiff became exhausted, although they duly notified him to make further payments, and thereupon they sold said shares at different dates commencing on the fourth and ending on the tenth of October, 1904, in accordance with the rules

and custom of the New York Stock Exchange where the order was executed; that they promptly rendered the plaintiff an account of the transaction to which he not only made no objection, but on the other hand ratified and affirmed the same. They also pleaded a counter-claim for a balance due them on the transaction amounting to $4.77 and a reply thereto was served by the plaintiff.

On the first trial the jury rendered a verdict in favor of the plaintiff for the sum of $26,054, but the judgment entered thereon was reversed on appeal by the Appellate Division upon the ground that the verdict was not war-ranted by the evidence. (130 App. Div. 598.) Upon a retrial at the close of all the evidence the court directed a verdict in favor of the defendants, although the plaintiff asked to go to the jury on all the issues. Upon appeal to the Appellate Division the judgment entered on the ver-dict so directed was unanimously affirmed, and the plaintiff appealed to this court.

*Frederick Wiener, Otto Horwitz* and *Frederick Cyrus Leubuscher* for appellant.

*Everett P. Wheeler* for respondents.

VANN, J. The question presented by this appeal is whether upon any reasonable view of the evidence the jury could have found a verdict in favor of the plaintiff for any amount. The answer to that question depends mainly upon the testimony of the plaintiff himself, who was sworn as a witness in his own behalf, and if his tes-timony was sufficient to make out a *prima facie* case the judgment against him should be reversed, even if the evidence produced in behalf of the defendants strongly tended to require a verdict in their favor. The credi-bility of the witnesses was for the jury, and by the action of the trial court in directing a verdict the plaintiff was prevented from having their judgment upon that subject.

The testimony of the plaintiff was substantially as fol-lows: He began to deal with the defendants as brokers in

October, 1903, and during the next six months made repeated purchases and sales through them of stocks upon a margin. During this period, on one occasion they carried for a very short time a purchase on account of the plaintiff amounting to more than $100,000 on a margin of less than $1,300. In May, 1904, after sustaining heavy losses, he sold his holdings with them, paid all he owed them, and ceased to operate in stocks until the latter part of the following September, when upon the urgent advice of Mr. Halsey, one of the defendants, he bought in different lots 1,000 shares of Reading at 68 and a fraction, the first purchase having been made on the 26th and the last on the 29th. No margin was asked for and none was paid until the first of October, when the plaintiff gave them a check for $1,000. On the same day Mr. Halsey called him on the telephone and, stating that he had information of a rise in the value of Steel preferred, urged him to buy some. The plaintiff declined, but a day or two later he was called up again by Mr. Halsey, and upon his advice gave an order to buy 500 shares of that stock. No margin was furnished, except said sum of $1,000 paid on the first, until the morning of the fourth, when the plaintiff had a personal interview with Mr. Halsey at the office of the defendants. After some general conversation about stocks Mr. Halsey stated that Steel preferred was booming and he was advising all his friends and customers to buy it. The plaintiff said: " Mr. Halsey, I have already bought 500 shares of Steel preferred on your recommendation and I would like to carry more but I am not so sure about the information. Now what is this information? Between man and man is it reliable?" Mr. Halsey replied: " Our sources of information are very good. I believe they can be relied upon and I think that Steel preferred is a good purchase." In response to the suggestion that he should carry more of that stock the plaintiff said: " That is all very well, Mr. Halsey, but if I go in for more Steel I want to go in for a long pull. I don't intend to jump in and out in the usual way, and if your information is correct I can make a good many

points of profit, but before I do anything further I want
to have an understanding with you as to where I stand
and what you are going to do for me. I have lost a
bunch of money in this office, as you know, more than I
can afford. I don't want to lose any more if I can help
it, but here is my check on account," and thereupon he
handed Mr. Halsey a check for $1,000. This made $2,000
in all that had been paid by the plaintiff on account of
both the Reading and the Steel Preferred that he had pur-
chased. Continuing the conversation he said: "Now
I don't want to take on any more Steel preferred than I
see my way through with and I want to know where
I stand with you." Mr. Halsey said: "Keller, I know
that you have lost a bunch of money in this office and
we want to see you win it back. We know how you
operate. We know what you are doing. We know how
you work. You place your orders and we will execute
them." The plaintiff replied: "That is all well enough,
Mr. Halsey, but that is not exactly what I am trying to
drive at. You know there are slumps and recessions in
the market, and you know it better than I do, and I will
be frank enough to say that I am not prepared to put up
a margin every time the market sags off a little." There-
upon Mr. Halsey, placing his hand on the shoulder of
the plaintiff, said: "All right, Keller, we will carry you
through." The plaintiff expressed his thanks, and after
shaking hands with Mr. Halsey on his statement said to
him: "On this understanding you may place another
order for my account for 1,500 shares Steel preferred,
additional, at the market." That purchase was at once
made, the order having been given in his presence.

The plaintiff remained in the office about half an hour
after this conversation watching the market, and seeing
that he had made a small profit on his Reading he ordered
it sold and realized a net gain of $287.50, which was
placed to his credit in his account. While still in the
office he observed a recession in Steel preferred and said
to Mr. Halsey: "You notice Steel preferred is off a
little." Mr. Halsey replied: "Yes, but that is only a

natural reaction. Don't be alarmed." The plaintiff remained in the office, and observing that Steel preferred had fallen a little more still, he went to Mr. Halsey and said: "I am carrying a pretty good load of Steel. Wouldn't it be a good idea to take on a little more to average up, because of the recession in price?" Mr. Halsey replied: "It wouldn't be a bad idea," and thereupon the plaintiff gave him an additional order for 1,000 shares of Steel preferred at the market price. The order was promptly executed, making in all 3,000 shares of Steel preferred purchased at an average of 76 and a fraction, or for about $228,000, although the entire margin paid by the plaintiff, including the profit on the Reading, was but $2,287.50.

In a short time the plaintiff left for his office, but on the way he called up the defendants by telephone and Mr. Dailey, a member of the firm, in response to the plaintiff's inquiry, said that the market had receded a little more and added: "Hold on a minute, Mr. Halsey wants to talk with you." Mr. Halsey then said: "I wanted to ask you if you could not put up a little more margin." The plaintiff said: "No. Our understanding was that I was not to be called upon every time the market sagged off a little." Mr. Halsey said: "Well, how about unloading a little bit. You are carrying a big load." The plaintiff said: "I know it, but I don't want to sell at present." Mr. Halsey replied: "All right, Keller, we will have to sweat it out together," and that ended the conversation, which took place between twelve and one.

Before three o'clock of the same day, and within an hour or two after the purchase of the 2,500 shares, the plaintiff was called on the telephone and he· recognized the voice of Mr. Dailey, who said: "Keller, Steel went off still more and we sold 1,300 shares of your Steel preferred." The plaintiff asked: "What is that?" and Mr. Dailey repeated his statement. The plaintiff said: "Well, you had a hell of a gall. You didn't have any order from me, and you had no right to sell. I won't stand for that sort of business. My understanding with Halsey this morning was

that I was to be carried and was not to be asked for additional margin, and now you have sold 1,300 of the Steel preferred without my order. It is a hell of a skin game. You have gone back on your word and I won't stand for it." Mr. Dailey said: "Don't get excited, don't get so mad." The plaintiff answered: "I have got a right to get mad. You went back on your agreement. You sold out 1,300 of my Steel preferred. You caused me a big loss and I won't stand for it. I know the stock is going up and you know the stock is going up and here you have sold me out at a loss."

The plaintiff further testified that nothing more occurred between the parties until the morning of the sixth when he received notice of the sale of 200 shares more of his Steel preferred with a letter dated the fifth, which among other things stated: " On the rally this afternoon we thought it advisable to lighten up a little which we did to the extent of 200 shares, as per report herewith. While Steel preferred had a set back to-day in conjunction with the rest of the market, from what we hear we really believe there is going to be a further advance in it and a consequent opportunity to make up past losses. We would, therefore, urge you to, if at all possible, arrange matters so as to protect your present holdings and take advantage of any opportunity that may offer. In the meantime we will do what we can and take such action as we may deem advisable and best for both your interests and our own protection, but with the understanding that the matter is left entirely to us and that you are to make good any debit or loss that may result."

The plaintiff swore that when these sales were made no more margin had been demanded; that he had given no authority to sell any of his Steel preferred and that when he received this letter on the morning of October sixth, he called the defendants up on the phone and said that he had received notice of the sale of 200 shares more and added: " You had no right to sell it. I never gave you an order, and I think your action is arbitrary. I also

38

received your letter in which you told me you were going to take my account in your own hands and do as you please with it. That is not right or it is not fair, according to our agreement and understanding. Of course, at the present time I am helpless, and your arbitrary action in taking my account out of my hands and operating it as you may see fit for yourselves is dead wrong, and I object. I objected to the sale of the 1,300, and I object to the sale of the 200 which you now report to me. It is a damn skin game. It is an outrage."

According to the plaintiff's version there was no further communication between the parties until about the tenth or eleventh, when Mr. Halsey called him on the telephone and said: "We have sold out your 1,500 shares and the balance of your Steel preferred." The plaintiff replied: "Well, that is just in line with the other work that you have been doing with the 1,300 and the 200. You sold it out without my authority, and I suppose I will have to take my medicine. You have violated your agreement. You have not kept faith with me." The sales resulted in a loss to the plaintiff of his entire margin, left him in debt to the amount of $4.77, and prevented him from realizing a fine profit from a rise in the market which began soon and continued for a long time. He made no further protest, but the next day, on receipt of a statement of the transaction, he called up the defendants, said that he had received it, and added: "I see I am indebted to you, according to your statement, $4.77. I suppose you will be sending a man around to collect it," and in great indignation hung up the receiver without waiting for a reply. No effort, however, was made to collect it, and no further communication passed between the parties until this action was commenced on the 17th of March, 1906.

During the entire time that the plaintiff dealt with the defendants, on the day after each transaction he usually but not invariably received a printed blank in which was written the purchases or sales of the day before and at the bottom, beneath the first printed signature of the defend-

ants' firm, was the following foot note in very fine print: " It is hereby understood and agreed that on all marginal business the right is reserved to close transactions when margins are becoming exhausted without further notice and to settle contracts in accordance with rules and customs of Exchange where order is executed.  C. D. Halsey & Co."  The plaintiff testified that he never read this notice until his attention was called to it by his counsel at about the time the action was commenced.

No argument is needed to show that the conversation between the parties, if it took place, authorized the inference that a contract was made and at once acted upon by the plaintiff.  We have quoted his testimony at such great length because we do not read it in several respects as the justices of the Appellate Division did when they heard the first appeal, assuming that the evidence was the same on both trials, as seems to be conceded.  They regarded the testimony of the plaintiff as incredible and as wholly without corroboration.  We also regard his testimony standing alone as hard to believe, but, as it seems to us, it was corroborated by the conceded fact that the defendants bought stock for him at a cost of over $228,000 on a magin of about one per cent, although, as Mr. Halsey testified, the usual margin on this stock is seven per cent.  This indicates that in view of the standing of the plaintiff, as the editor of a trade journal, and his previous losses, owing, as they wrote him, " to the danger of stop orders," they wished to help him retrieve his misfortunes and that they were willing to make an exception in his case and deal with him on terms of unusual liberality.  Their large purchases on a nominal margin bear with force on his theory that they made the special agreement to buy and carry stocks for him without requiring the usual margin, or one with any reasonable proportion to the amount expended.  He told them when the purchases were made that he could not put up more margin, yet they departed from the custom of the trade and their own custom to the extent of investing a fortune for him with no security to speak of except the

investment itself, which from its nature was precarious. These facts corroborated the plaintiff's story, however improbable it might be in itself, and, making it possible of belief, presented a question of fact for the jury as to whether the agreement as sworn to by him was actually made. The strong conflict in the evidence through the positive denials of the defendants is not now material, for the jury might have believed him.

If such a contract was made, even if it was too indefinite for specific performance, it was not wholly without effect. It was at least a waiver of the usual course of dealing and of all notices given as to the terms upon which stocks would be bought and carried. When reasonably construed, as it should be, it did not run for all time, but for a reasonable time, nor provide for an unlimited amount of purchases, but for a reasonable amount. The parties are presumed in the absence of specific language to have intended a reasonable and not an unreasonable result. The purchases in fact made must be deemed reasonable in amount, because they were approved by the defendants when ordered. In case of a heavy fall in the price of the shares, a reasonable construction of the contract would not permit the plaintiff to insist that they should be carried without further margin, but would authorize the defendants to demand more money, and if the demand was not complied with within a reasonable time, to sell upon reasonable notice. Whether the demand, if made, or the notice, if given, was reasonable or not, would depend on all the circumstances and thus present a question of fact, unless so obviously unreasonable as to present simply a question of law.

The defendants insist that the purchases in question were made pursuant to a contract in writing, and they base their claim on the foot note appended to previous notices, and especially on one dated September 26th, 1904, relating to the purchase of the shares of Reading. The notice by mail of the purchase of the first 1,500 shares of Steel preferred had no effect, as they were bought and sold on the same day and within a period of about two

hours. The defendants could waive all previous notices and agree in the future to buy and carry on a nominal margin, and this is the legal effect of the agreement, if one was made. The plaintiff does not attempt to enforce by specific performance, but sues for the conversion of his property invoking the agreement as a waiver and, if made, it was effective as a waiver as to the shares bought after the alleged arrangement and in reliance thereon. The service of a notice after each purchase with the usual foot note did not, under the circumstances, conclusively establish a written contract and had effect only as evidence to be considered in connection with the testimony of the plaintiff. Such a notice is not like an insurance policy on which the company signing is sued, or a deed which conveys the title, although both, like the foot note, are signed by one party only. While acceptance of a policy or deed completes the contract, the mere receipt of a notice with a foot note may or may not make a contract, depending on the intention as shown by the surrounding facts.

As each purchase was made the plaintiff became the owner of the shares and the pledgor thereof to the defendants. They were his property, subject to the lien of the pledgees, and a sale thereof without authority would constitute a conversion. (*Content* v. *Banner*, 184 N. Y. 121, 124.) If the agreement was made, the defendant had no right to call for more margin, unless the price of the shares fell so decidedly as to make it unreasonable to carry them longer without further protection, and whether it did or not involved a question of fact. No demand for more margin, however, was actually made, if the plaintiff is to be believed, for he denied receiving any letter to that effect, and testified that when Mr. Halsey suggested "a little more margin," and spoke of "unloading a little bit," he peremptorily refused on the strength of their understanding, whereupon Mr. Halsey closed the conversation by saying: "All right, Keller, we will have to sweat it out together." The letter of October 5th was neither received nor written until after the 1,500 shares

had been sold, so that it had no application except to the last sale.

Even if the agreement was not made the defendants had no right to sell the shares without notice, yet within an hour or two after the purchase of the 2,500 shares they sold a majority thereof, according to the evidence of the plaintiff, without notice and without authority. (*Content* v. *Banner, supra.*) The defendants did not attempt to prove notice of time and place of sale, but rested on the rules of the Stock Exchange, although Mr. Halsey testified that they applied only to dealings between brokers.

Whether the plaintiff ratified the sales involved a question of fact. He protested vigorously and while he used language which is invoked to establish acquiescence, the jury might have found that it was a cry of despair, made because he could not help himself as the defendants had the power to sell, even if they had no right to sell. The statement sent by the defendants showing a small balance in their favor, when read in connection with the protest of the plaintiff, obviously did not establish an account stated.

Whether certain letters from the defendants calling for more margin reached the plaintiff was likewise a question of fact, for the evidence that they were written, copied and mailed in the usual course of business was met by his statement that he never received them.

The case turns on the question whether the alleged agreement was actually made and that was a question of fact, with the plaintiff's version supported by the corroboration mentioned, and contradicted by the testimony of two of the defendants as well as by the written evidence. It was for the jury to look into the faces of the witnesses and in view of the burden of proof and of all the circumstances and probabilities, to decide whether the plaintiff was to be believed. He had the legal right to have the jury pass upon his credibility as a witness, and, hence, the direction of a verdict was an error of law that calls for a new trial.

The judgment should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., and CHASE, J., concur; GRAY, J., concurs in result; HAIGHT and WERNER, JJ., dissent; WILLARD BARTLETT, J., absent.

Judgment reversed, etc.