MARJORIE AFFLECK FRAZIER HENDERSON, *et vir,* v. HARRY A. USHER and JOHN G. JACKSON, as Executors and as Trustees under the last Will and Testament of Frank Duff Frazier, deceased, *et al.*

170 So. 846.
Division A.
Opinion Filed September 21, 1936.
Petition to Recall Mandate and Leave to File Rehearing Denied December 10, 1936.

710

*E. J. L'Engle, J. W. Shands, Edward McCarthy, Jr.,* and *Chadbourne, Stanchfield & Levy* (New York City), for Appellants;

*Sullivan & Donovan* (New York City), *Fred M. Valz, Robert H. Anderson, Wideman, Wideman* and *Manley P. Caldwell,* for Appellees.

PER CURIAM.—Frank Duff Frazier of Palm Beach

County, Florida, died June 21, 1933, and left surviving him his widow, Marjorie Affleck Frazier, and a daughter by a former marriage, Diana Duff Frazier, a minor. He left a will, dated June 16, 1933, in which he made provision for his widow and his minor child, and made a contingent provision for Yale University. The will was admitted to probate in Palm Beach County on June 28, 1933.

Harry A. Usher and John G. Jackson, who were testamentary trustees under the will, were appointed Executors of the Estate of Frank Duff Frazier, deceased; and letters testamentary issued to them.

At the time of his death, Frank Duff Frazier had a brokerage account with Clark, Childs & Keech, which was the successor to Keech & Company. This firm had purchased for the account of Frazier securities valued, at the time of his death, at $338,263.75, for which he was indebted to the brokers in the amount of $202,236.88, and the securities were retained by the brokers to secure payment of the balance due. The Executors, by selling some securities held on this account, and some securities held in the strong box, together with an advance from the Frazstate Corporation, paid this balance due.

At the time of his death, Frank Duff Frazier owner (1) a lot in Palm Beach valued at approximately $65,000.00; (2) tangible personal property, such as household and personal effects, boats and the like in Palm Beach County, appraised at $33,478.00; (3) tangible personal property consisting of household and personal effects, automobiles and the like, in New York, appraised at $54,579.60; (4) intangible property consisting of shares of stock of the market value of $701,829.47; and bonds of the market value of $162,154.38, which stocks and bonds included those held on the account with Clark, Childs & Keech; (5) some land in

Oregon, not involved in this litigation, worth approximately, $10,000.00; (6) in addition to cash and some mortgages.

The widow, Marjorie Affleck Frazier, on August 5, 1933, married Holcombe Henderson. Then on October 27, 1933, she filed, in the County Judge's Court of Palm Beach County, her dissent, in writing, to the will of Frank Duff Frazier, deceased, and claimed dower in his estate.

The Executors, on November 18, 1933, due to the alleged inadequacy of the statutory proceedings, filed their bill of complaint against the widow, Marjorie Affleck Frazier Henderson, the daughter, Brenda Diana Duff Frazier, and Yale University praying that the Chancellor appoint a Special Master to allot unto the widow, Marjorie Affleck Frazier Henderson, such dower interest as she may be entitled to and that the decree appointing the Master determine and adjudicate the following questions:

(1) Whether dower should be allotted in the gross value of the brokerage account or whether it should be limited to the equity of redemption in and to such securities; (2) whether the dower interest of the widow shall be charged with its proportion of the inheritance and estate taxes, and the costs and expenses of preserving the property of the estate; (3) whether the total value of decedent's tangible property in New York City should be considered in allotting dower or whether the balance of said property, after deducting New York inheritance taxes and debts, should be considered in alloting dower; (4) the most equitable method of allotting dower in said real estate; (5) whether the Executors should hold the specific personal property and deliver it to Brenda Diana Duff Frazier, and allot the widow dower in other portions of the estate.

Each of the defendants, Marjorie Affleck Frazier Henderson and Holcombe Henderson, her husband; Brenda

Diana Duff Frazier and Brenda Watriss, her guardian; and Yale University filed separate answers to the bill of complaint.

After the introduction of all of the evidence, the Chancellor entered final decree in the cause, in which he appointed Ernest Metcalf, Esq., Special Master, and ordered him to take testimony regarding the character and value of the real property in Florida, and all of the personal property wherever situated of which Frank Duff Frazier died seized and possessed, the property held by the Executors or the proceeds substituted therefor, the liens against the property, the estate taxes imposed on the property, the income derived from the estate from the date of decedent's death, the expenses of preserving and maintaining said property, and such other testimony as may be material to this reference; and that as soon as practicable after the taking of testimony is complete to allot Marjorie Affleck Frazier Henderson dower in said real and personal property in the manner provided by the decree, and report such allotment with recommendations of law and fact to the court for confirmation, modification, amendment or disaffirmance.

The final decree decided in the following manner the questions asked by the Executors in their bill of complaint:

"6. It appearing to the Court from the evidence adduced that dower in decedent's real estate in Florida, being the property situated in Palm Beach County, Florida, described in Paragraph V of the bill of complaint, cannot practicably be allotted in kind or specie, said Special Master shall determine the method of allotting dower, other than division in kind, which appears to be for the best interests of all parties to this suit, either by award of a gross sum or the imposing of an annual charge upon said lands, or otherwise; said Special Master shall recommend to the

Court in detail the most equitable manner of making such allotment.

"7. It appearing to the Court that at the time of decedent's death, he was the owner of an equity of redemption in certain securities held by the brokerage firm of Clark, Childs & Keech, of New York City, subject to lien of $202,236.88, created by brokerage contract attached to the bill of complaint as Plaintiffs' Exhibit 'D,' and that the defendant, Marjorie Affleck Frazier Henderson, is entitled to dower only in said equity of redemption in said brokerage account and not in the gross value thereof, said Special Master is ordered and directed to allot the said defendant, Marjorie Affleck Frazier Henderson, one-half of the equity of redemption in said brokerage account, as the same shall be found and determined to exist at the date of the death of the decedent.

"8. It further appearing to the Court that decedent's estate is liable for Federal estate taxes and estate taxes of the States of New York and Florida in substantial amounts, and that the dower interest of the widow in decedent's property should bear its proportionate part of said estate taxes, said Special Master is ordered, in allotting to said Marjorie Affleck Frazier Henderson dower in the property of decedent, to charge said defendant and her dower interest with a portion of said estate taxes proportionate with the amount of property being received by said defendant by way of dower.

"9. It appearing to the Court that at the time of his death decedent owned tangible personal property in the State of New York of substantial value, and owed debts to creditors residing in the State of New York of less amount than the value of said tangible personalty, and that the debts of such creditors are a charge upon said tangible

personalty, said Special Master is directed and ordered, in allotting to said defendant, Marjorie Affleck Frazier Henderson, dower from said tangible personal property, not to deduct from said dower interest allotted her any part of the debts owned by decedent at the time of his death to residents of the State of New York.

"10. It further appearing unto the Court that under Article Sixth of decedent's will the defendant, Brenda Diana Duff Frazier, is entitled to the household goods and furniture, silver, plate, linen, jewelry, wearing apparel, and articles of personal use and adornment, books, pictures, engravings, works of art, boats, automobiles and all other articles of personal property belonging to decedent's households or domestic establishments, subject to the dower rights of the defendant, Marjorie Affleck Frazier Henderson, and that dower should be allotted in such manner as to affect the interests of beneficiaries under the decedent's will as little as possible and in accordance with principles of justice, said Special Master is ordered and instructed, in allotting the dower interest of said widow in aforesaid personal effects, to allot unto her other property of a value at the time of the death of the decedent equal to one-half of the value of said personal effects hereinabove described, to the end that said personal effects may be distributed by the plaintiffs to the defendant, Brenda Diana Duff Frazier, free and clear of the claim of said defendant, Marjorie Affleck Frazier Henderson, therein; provided the guardian of the infant, Brenda Diana Duff Frazier, shall elect to take the above described personal effects in whole or in part, free of dower; within thirty (30) days from the date of this decree, said election to be in writing, duly filed with the Master.

"11. That said Special Master state an account of the

income received by said executors from the assets of said Estate from the time of decedent's death on June 21st, 1933, to the date of the completing of the taking of testimony as above provided, and of the costs and expenses of preserving and maintaining said assets, crediting the widow with one-half of the net income, and debiting her with one-half of said costs and expenses, and shall charge or credit the net result of such credit and debit to or against the remainder of the property being allotted to said Marjorie Affleck Frazier Henderson.

"12. That said Special Master shall allot to said defendant, Marjorie Affleck Frazier Henderson, one-half of the personal property owned by the decedent at the time of his death in such manner as seems to said Master desirable and practicable, subject to the other provisions of this decree. Said Special Master be, and he is hereby empowered to take all actions and do such things as are reasonably necessary and incidental to the exercise of the duties herein imposed."

From the final decree, Marjorie Affleck Frazier Henderson appealed.

Appellant assigned eight errors; while appellees, the executors, filed a cross assignment of errors, assigning two errors.

It is contended by appellee, Brenda Diana Duff Frazier, that Marjorie Affleck Frazier Henderson, having remarried before making her election to take dower, under Sections 5493 (3629) and 5494 (3630) C. G. L., was not a "widow" within the meaning of the term as used therein, allowing a widow to elect whether she would take under the will or take dower.

This question is not properly presented for review by this Court as the question was not cross assigned as error. See

Gay v. Whiddon, 64 Fla. 295, 59 So. 896; Morgan v. Jones, 52 Fla. 543, 42 So. 242; Harvey v. Hayes, 71 Fla. 346, 71 So. 282; Punta Gorda State Bank v. Wilder, 93 Fla. 301, 112 So. 569, 571; Oates v. Prudential Life Insurance Co., 107 Fla. 224, 144 So. 418. The two cross assignments of error were made by the Executors and not by the Minor, and related to matters affecting the allotment of dower and not the right of the widow to elect.

However, in order to avoid incurring litigation as to whether or not Marjorie Affleck Frazier Henderson was decedent's "widow" at the time she made her election, such question has been considered.

The statute provides that "when any person * * * shall make his last will and testament, and not therein make any express provisions for his wife by giving and devising unto her such part or parcel of real and personal estate as shall be fully satisfactory to her, such widow may signify her dissent thereto in the circuit or county judge's court of the county wherein she resides at any time within one year after the probate of such will." Section 5493 (3629) C. G. L.

Marjorie Affleck Frazier Henderson filed her dissent to the will of her deceased husband, Frank Duff Frazier, within the period and in the manner prescribed by the statute. The only question is whether her marriage to Holcombe Henderson barred her from subsequently filing her dissent to the will of Frank Duff Frazier, as the widow of the latter.

It was decided in Woodberry v. Matherson, 19 Fla. 778, 785, that the widow's title to the personal estate, whether it came by way of dower or by taking a child's part, became absolute upon the death of her husband. It is fixed by law, is a vested interest and *cannot be affected or de-*

*feated by her subsequent marriage or death.* This decision, to which we adhere, held, in effect, that the right to dower vests at the death of the husband, even though the widow's dissent to the husband's will may not be made for several months, the dissent operating as of the date of the husband's death. The widow is allowed a year's time in which to choose whether she will take dower or whether she will take under the will, but the choice relates back to the death of the husband; and her subsequent remarriage does not affect in any way her right to dower. The statute operates as a statute of limitations upon the widow enforcing her right to dower. For cases holding that remarriage does not affect a widow's status as a widow, see Christman v. Linderman, 202 Mo. 605, 100 S. W. 1090, 10 L. R. A. (N. S.) 1205, 119 A. S. R. 822; Lamkin v Knapp, 20 Ohio St. 454; *In re* McArthur's Estate, 210 Cal. 439, 292 Pac. 469, 72 A. L. R. 1318; *In re* Iltz' Estate, 104 Ore. 59, 202 Pac. 409; Matthews v. Marsden, 71 Mont. 502, 230 Pac. 775; Miles v. Miles, 46 N. H. 261, 88 Am. Dec. 208; Nichols v. Purczell, 22 Ia. 265, 89 Am. Dec. 572; Harrelson v. Webb, 124 La. 1007, 50 So. 833, 134 A. S. R. 539; Davis v. Neal, 100 Ark. 399, 140 S. W. 278, L. R. A. 1916A 999; West v. McMullen, 112 Mo. 405, 20 S. W. 628; Georgia Railroad & Bank Co. v. Garr, 57 Ga. 277, 24 Am. Rep. 492.

The word "widow" as used in Sections 5493 (3629) and 5503 (3630) C. G. L. refers to the person who is to take and not to her status or condition whether she remains a widow or marries again. See *In re* McArthur's Estate, 210 Cal. 439, 292 Pac. 469, 72 A. L. R. 1318; Matthews v. Marsden, 71 Mont. 502, 230 Pac. 775; Davis v. Neal, 100 Ark. 399, 140 S. W. 278; Georgia Railroad & Bank Co. v. Garr, 57 Ga. 277, 24 Am. Rep. 492. Section 5494 (3630) C. G. L. uses the word "wife" instead of "widow" to de-

scribe the same person as mentioned in Sections 5493 (3629) and 5503 (3639) C. G. L. as "widow," thus showing that the word "widow," as used therein, refers to the person.

The first question presented is whether the widow is to have her dower in the gross value or in the next value of the brokerage account of her deceased husband.

At the time of his death, Frank Duff Frazier had a brokerage account valued at $338,263.75, for which he was indebted to his brokers in the sum of $202,236.88. The Executors paid this sum due the brokers from the personal estate of decedent, without consulting the widow.

The contract between Frank Duff Frazier, customer, and F. B. Keech & Company, broker, dated August 22, 1930, contained the following provisions:

"1. All orders are received and executed subject to the rules and customs of the market or exchange and its clearing house, if any where executed. You may employ sub-brokers and shall be responsible only for reasonable care in their selection;

"2. All liability of the undersigned to you shall be secured by all stocks and/or securities of the undersigned held by you, and you are hereby authorized, without notice to the undersigned, and without having in your possession or subject to your control other stocks and/or securities of the same kind and amount, to loan and repledge (either for the amount due you from the undersigned or for a greater sum) the same in your business from time to time separately or together with other stocks and/or securities; and you shall only be liable to deliver to the undersigned stocks and/or securities of the same kind and amount;

"3. You may at any time terminate all accounts and thereupon all amounts advanced and other balances due, with interest, and commissions shall be due and payable;

"4. You may close out any marginal accounts, in part or in whole, whenever in your sole discretion the margin therein may not meet your requirements, by selling stocks and/or securities of the undersigned held by you at public or private sale, or by buying at public or private sale any or all stocks and/or securities sold for but not received from the undersigned, all without prior tender or notice to or demand upon the undersigned, and upon any such public sale you may purchase the whole or any part thereof free from any right of redemption, and the undersigned shall remain liable for any deficiency; no specific tender, demand or notice, or any failure or delay on your part to exercise such right of closing out such accounts shall invalidate your right of closing such accounts or invalidate this waive of tender, demand and notice;

"5. The undersigned agrees to pay you upon all debit balances of not less than $5,000 interest at such rate or rates as you may charge in connection with such balances;

"6. All statements of account to the undersigned shall be considered correct unless you receive written notice from the undersigned to the contrary within ten days after the mailing thereof by you;

"7. This contract can be amended only in writing, duly signed by the undersigned and a member of your firm;

"8. That this agreement and its endorsement shall be governed by the laws of the State of New York."

To best understand the relation between a broker and his customer, we should review the duties owed by the broker to the customer and the duties owed by the customer to the broker.

"The broker undertakes and agrees—

"1. At once to buy for the customer the stocks indicated.

"2. To advance all the money required for the purchase, beyond the ten per cent furnished by the customer.

"3. To carry or hold such stocks for the benefit of the customer so long as the margin of ten per cent. is kept good, or until notice is given by either party that the transaction must be closed. An appreciation in the value of the stocks is the gain of the customer, and not of the broker.

"4. At all times to have in his name or under his control, ready for delivery, the shares purchased, or an eqaul amount of other shares of the same stock.

"5. To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker; or

"6. To sell such shares upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale.

"Under this contract, the customer undertakes—

"1. To pay a margin of ten per cent. on the current market value of the shares.

"2. To keep good such margin according to the fluctuations of the market.

"3. To take the shares so purchased on his order, whenever required by the broker, and to pay the difference between the percentage advanced by him and the amount paid therefor by the broker." Markham v. Jaudon, 41 N. Y. 235.

It would be helpful to briefly relate how an ordinary transaction on a trading account is consummated, as between the broker and the customer. To open a trading account, the customer deposits with the broker a certain amount as margin, which may be in money or in stocks and securities or in both. The margin must at all times be equal

to or greater than a net minimum perecntage of the market value of securities purchased for the account of the customer. The minimum margin requirements are now under the jurisdiction of the Federal Reserve Board, and are much higher than formerly. 15 U. S. C. A. 78(g). The broker looks to the customer for identity on the transaction regardless of the margin paid. The customer gives the broker an order, either written or verbal, to buy or sell a certain number of shares of a certain stock at a certain price or at the market price; and the broker goes into the Stock Exchange and makes a verbal contract accordingly with another broker. Frequently the broker deputizes a subordinate broker to complete the transaction for him. The brokers, in making the transaction with one another, look to the other contracting broker to carry out the transaction, and in practice no attempt is made to enforce liability against the principal, or client, whether he be known or not. Stocks are purchased on the floor of the Stock Exchange in 100 share lots and multiples of that number, and bonds are purchased in $10,000.00 lots and multiples of that number. When a broker gets an order for less than that amount, he must make purchases through an odd lot broker, who buys in the above mentioned lots and sells to other brokers in small lots, at prices ranging from one-eighth to one-fourth dollar per share higher in price. The same is true when the small lots are sold back to the odd lot brokers. See Don Passos—Stock Brokers & Stock Exchanges, Vol. 1, pp. 182-185.

There are different ways in which a customer may trade in stocks. The customer may buy stocks "long," which is where he purchases stocks now with the expectation of selling them for a profit in the future; or he may sell them "short," which is where he sells stocks he doesn't possess,

and borrows the number of shares he has sold from some third person to deliver to his vendee, expecting to be able to buy the stocks later at a lower figure and returning them to the person from whom he borrowed them; or he may purchase a "call," which is a contract by which the party signing the same agrees for a stipulated consideration to deliver, at the option of the party named therein, or his order or bearer, the securities therein mentioned, at a certain day for a certain price; or he may purchase a "put," which is also an option contract, except that the party holding the same has the option of delivering the securities to the maker; or he may purchase a "straddle," which combines the advantages of a "put" and a "call," being a contract by which the holder has the option either to deliver or have delivered to him certain stocks at the prices designated in the writing. See 1 Don Passos—Stock Brokers and Stock Exchanges pp. 200-204.

The distinctions between an ordinary broker and a stock broker are outlined in the case of Markham v. Jaudon, 41 N. Y. 235, 256 as follows:

"In the first place, the stock dealer who is employed, though called a stock broker, does not act as broker in this transaction. It is no part of the office or duty of a broker to pay the price. It is no part of the office or right of a broker to receive the property, still less to take the title to his own name. In this transaction he acts in a peculiar business, in his own name and on his own responsibility, protected against loss by the indemnity furnished, or by the agreement to be furnished to him.

"The idea of mere agency, ordinarily suggested by the name broker, does not therefore arise out of the fact that the dealers in stocks for the account of others, as to profit and loss, are called stockbrokers.

"In the next place, the transaction, according to the intent and purpose of the employment of the broker, does not contemplate that the customer will ever receive the stock or own it. It may be, that if the broker desires to close his connection with the transaction, the customer, if he pays the cost, interest and all commissions which the broker has earned or is entitled to earn, will receive the stock, whether he may so insist or not, is a collateral question; and if he be so entitled, it will neverthless be true, that this is not in pursuance of the arrangement, but a departure from it, for the intent is that the stock shall be carried by the broker until directed to be sold, the customer never having the title to the stock at all.

"And finally, in my opinion, the transaction is an executory agreement for a pure speculation in the rise and fall of stock, which the broker, on condition of perfect indemnity against loss, agrees to carry through in his own name and on his own means or credit, accounting to his customer for the profits, if any, and holding him responsible for the loss."

A stockbroker partakes of the nature of a "broker," a "pledgee" and a "trustee."

"He is a Broker because he has no interest in the transaction, except to the extent of his commission; he is a pledgee, in that he holds the stock, etc., as security for the repayment of the money he advances in its purchase; so he is a trustee, for the law charges him with the utmost honesty and good faith in his transactions; and whatever benefit arises therefrom enures to the *cestui que trust;"* 1 Don Passos—Stockbrokers & Stock Exchanges pp. 180-181.

The stock dealings between Frank Duff Frazier and his broker, according to the terms and provisions of the contract he entered into with F. B. Keech & Company, con-

stituted a pledge of the stock as security for an engagement to pay the advance made by the broker together with interest and commissions. Markham v. Jaudon, 41 N. Y. 235, as page 242. See also Small v. Housman, 208 N. Y. 115, 101 N. E. 700; Keller v. Halsey, 202 N. Y. 588, 95 N. E. 634. Such transaction is comparable to a person advancing collateral security for a loan of money. See Meyer —Stockbrokers & Stock Exchanges 253; McIntyre v. Whitney, 139 App. Div. 557, at page 559, 124 N. Y. S. 234.

Section 5503 (3639) C. G. L. provides that the widow is entitled to have allotted and set off to her that portion of the personal estate of which her *husband died possessed,* and to which by law she is entitled.

Section 5494 (3630) C. G. L. provides that "when a husband * * * shall make his last will and testament and not make provisions therein for his wife, as expressed in Section 5493, she shall be entitled to a share in the personal estate in the following manner, to-wit * * * if there be but one child, she shall be entitled to one-half * * * part in fee simple, and such claim shall have preference over all other and the said share shall be free from all liability for the debts of the decedent."

Prior to the Probate Act of 1933, which became effective October 1, 1933, dower in real property was confined to a life estate in all real property of which the husband died siezed and possessed, or which he had conveyed during coverture, in which dower had not been relinquished. Sec. 5493 (3629) C. G. L. Whereas, dower in personal property is an estate therein "in fee simple," Sec. 5494 (3630) C. G. L., in all personalty "of which her *husband died possessed."* Sec. 5503 (3639) C. G. L.

The common law as to dower prevails in Florida except as modified by statute. Walker v. Close, 98 Fla. 1103, 125

So. 521. At common law dower existed only in real property, see Woodberry v. Matherson, 19 Fla. 778, 781, but by statute dower has been enlarged so that it also embraces personal property. Sec. 5494 (3630) C. G. L.

The right of dower in personal property, in this State, is an inchoate interest, contingent during the life of the husband, but rendered absolute by his death. Smith v. Hines, 10 Fla. 258. The claim of the widow to dower in personal property stands higher than the claims of creditors of the deceased husband, Smith v. Hines, 10 Fla. 258, 284; Section 5494 (3630) C. G. L., and the widow, by dissenting from the husband's will, is entitled to dower free from the debts of the husband. Cooper v. Taylor, 54 Fed. (2d). 1055.

The widow has a right to have dower in the personal property of which the husband *died possessed,* and such dower is not subject to any of the husband's debts. Was the amount due on the purchase price of these stocks and securities, for the payment of which amount the stocks and securities were held and could be sold by the broker, if the margin to the customer's credit had become insufficient, due to the fluctuations in the market price of the stocks and securities so held, a "debt" of the husband within the meaning of that term as used in the statute? Sec. 5494 (3630) C. G. L. It is apparent that the statute awarding the widow dower in the personal property of the husband did not contemplate that she would be allowed· more than one-third or one-half, as the case may be, of the personal property of her deceased husband of which he died possessed. When the decedent bought the stocks and securities "on margin," his property rights therein and thereto were expressly made, by the purchase agreement, subject to the right of the broker to hold the stocks and securities until all amounts due the

broker by the customer under the contract had been paid in full. The widow takes dower in such rights in and to the stocks and securities as her deceased husband had at the time of his death, which was the right to possess the stocks and securities or the value thereof remaining after all claims of the broker under the contract had been fully satisfied out of the stocks and securities or their value. And under such circumstances, the widow has no right to call on the executor or administrator to pay the amount due in the purchase of the property. See Hewitt v. Cox, 55 Ark. 225, 15 S. W. 1026.

"The stock held by the pledgee as collateral is no part of the pledgor's estate, in case of the latter's death, until the debts which such stock secures are paid, and until such time the pledgee is entitled to hold the stock as against the pledgor's executor or administrator, and as against the claims of the pledgor's surviving widow for a year's allowance and in lieu of homestead." 14 C. J. 730, Sec. 1111.

"The interest of the pledgor in the property pledged is entirely separate and distinct from that of the pledgee; and upon a contract of pledge, the general property or title in the thing pledged remains in the pledgor, subject to a lien in favor of the pledgee for the amount of the debt or obligation for which the pledge is given.

\* \* \*

"Upon the death of the pledgor the property remains as it was when pledged; it belongs to his estate, encumbered, however, with the charge put upon it by decedent for the payment of his debt." 49 C. J. 922, 923, Sec. 57.

Inasmuch as the husband could not, under the contract, have had full title to or have taken the securities out of the possession of the broker without paying the amount due on them under the contract of purchase, it cannot be said

that the decedent was in possession, at the time of his death, of more than his ultimate rights in the brokerage account, which was that which remained after payment in full had been made of all sums due to the broker under the contract. Consequently the widow is entitled to dower only in the rights held by her husband, at the time of his death, in such brokerage account.

The second question is whether the widow's dower is subject to estate and inheritance taxes.

Section 2 of Chapter 14379, Acts of 1931, provides that an inheritance and estate tax shall be imposed upon the interest of the net estate of every decedent dying after May 16, 1931, whether a resident or non-resident of the State of Florida. Sec. 1342 (2) C. G. L. Supp.

Section 48 of this Chapter provides that "the estate of every decedent whose property shall be subject to the laws of the State of Florida, shall be deemed *prima facie liable for estate or inheritance taxes* under this law, and shall be subject to a lien therefor in such amount as may be later determined to be due and payable on such estate as provided in this law. Such presumption of liability shall begin on the date of the death of the decedent and shall continue until the full settlement of all taxes which may be found to be due under this law, such settlement to be shown by receipts for all taxes due to be issued by the Comptroller as commissioner of revenue as provided for in this law." Sec. 1342 (48) C. G. L. Supp. (emphasis supplied).

Section 19 of the Act provides that "the executor or administrator or other trustee paying any legacy or *share in the distribution of any estate* subject to said tax shall deduct therefrom at the rate prescribed, or if the legacy or share in the estate be not money, he shall demand payment for a sum to be computed at the same rates upon the appraised

value thereof for the use of the State; and no executor or administrator shall pay or deliver any specific legacy or article to be distributed, subject to tax, except on the payment into his hands of a sum computed on its value as aforesaid." Sec. 1342 (19) C. G. L. (emphasis supplied).

Under the sections of the Act quoted above, it is clear that the estate was taxable under the provisions of the Act. The estate is held *prima facie* liable for the taxes and a lien is imposed thereon for the amount of the tax. The lien attaches on the date of the death of the decedent and continues until all of the tax is paid. The executors are authorized by this law to deduct from *any share in the distribution of the estate,* which includes the dower of a widow who has dissented from her deceased husband's will, the amount of the tax at the rate prescribed in the Chapter itself. The duty is placed on the executor or the administrator, as the case may be, to see that the tax is paid before the property of the estate leaves his hands for distribution, as he will be held responsible for payment thereof if not paid within two years. Sec. 1342 (36) C. G. L. Supp.

The decisions as to whether a widow's dower is subject to inheritance and estate taxes are in conflict. 26 R. C. L. 221, 222, Sec. 191. The better view, however, seems to be that the widow's dower is subject to payment of inheritance and estate taxes. To hold otherwise would, in cases of this kind, where the bulk of the estate consists of personal property, and where the widow is entitled to one-half of the personal property and the only child of the deceased is entitled to the other half, compel the child to pay out a large proportion of her rightful share of the property in taxes. This would diminish considerably the amount of the estate that the testator intended the child to have, and would give the widow more than the statute intended

her to have, and would work an unjust result. In the absence of statute, no known principle of law is violated by subjecting the widow's dower to payment of inheritance and estate taxes. Such interpretation accords with the intendments of the statutes. For authority holding that the widow's dower may be subjected to the payment of an estate and inheritance tax see Billings v. People, 189 Ill. 472, 59 N. E. 798, 59 L. R. A. 807; State v. Dunn, 174 N. C. 679, 94 S. E. 481, Ann. Cas. 1918D 1086; 26 R. C. L. 221, Sec. 191.

The Congress of the United States has provided that there shall be a tax imposed upon the transfer of the net estate of each decedent, (26 U. S. C. A. 410) the value of the net estate being determined by deducting from the gross value of the estate, among other things, *claims*. 26 U. S., C. A. 412. It is further provided that credit can be had on this tax for payment of any estate or inheritance taxes actually paid to any state in respect of any property included in the gross estate, provided the credit allowed does not exceed 80% of the tax imposed by 26 U. S. C. A. 410.

Under the law existing at that time 20% of the tax would be paid the Federal government and 80% of the tax would be paid the State of Florida.

The Federal government is not concerned with who shall ultimately bear the burden of paying the estate taxes, but concerned only with collecting the tax, leaving it to the states to fix the time and principle or method of determining who should assume the burden of paying the tax. See Hill v. Grissom, Collector of Internal Revenue, 299 Fed. 641; Young Men's Christian Association of Columbus, Ohio, v. Davis, 264 U. S. 47, 44 Sup. Ct. 291, 68 L. Ed. 558; Edwards v. Slocum, 287 Fed. 651; affirmed in 264 U. S. 61, 44 Sup. Ct. 293, 68 L. Ed. 564.

Therefore, from a consideration of the statute law applicable to the case at that time, we conclude that the widow's dower was liable for its proportionate part of the estate and inheritance tax.

The third question is whether the widow is entitled to allotment of dower in the household goods and effects of her deceased husband in specie.

The sixth paragraph of decedent's will provided that:

"Except as above provided, all and singular the household goods and furniture, silver, plate, linen, jewelry, wearing apparel and articles of personal use or adornment, books, pictures, engravings, works of art, and all boats, automobiles, and all other articles of personal property pertaining to my households or domestic establishments, belonging to me at the time of my death, I give and bequeath to my wife Marjorie A. Frazier and my children, to be divided between them by my Executors in such proportions and in such manner as they in their absolute and uncontrolled discretion shall deem proper, and any division of such articles equal or inequal shall be binding and conclusive upon the said legatees. I request, however, that my Executors shall in making such division and distribution observe any written request I may leave."

The personal property of decedent was, under the will, to be divided between the widow and child as the Executors might in their uncontrolled discretion determine.

Paragraph 10 of the Chancellor's final decree held that the personal effects of the decedent belonged to the daughter subject to the dower rights of the widow, and that dower should be allotted in the personal effects so as to affect the provisions of the will as little as possible, and in accordance with the principles of justice. This part of that paragraph of the decree clearly recognized the rights of the

widow's dower in the personal effects of decedent as superior to the rights of the child therein; and this paragraph also held that the daughter had rights in regard to having allotted to her part of this property in specie. The statute allowing the widow to elect to take dower instead of taking under the provisions of the will, would, in this case, permit the widow to claim one-half of the personal effects of decedent in kind. Sec. 5494 C. G. L.

The latter part of paragraph 10 of the final decree ordering that the Special Master shall allot to the widow other property of a value equal to one-half that of said personal effects hereinabove described, at the time of decedent's death is not authorized by the provisions of Section 5494 (3630) C. G. L., and must be reversed.

However, there is nothing inconsistent with the principles of justice or of the dower rights of the widow in the first part of paragraph 10 of the decree, and that part is allowed to stand on the record as presented in this case.

The fourth question is whether paragraph 11 of the final decree is erroneous in charging to the widow one-half of the expenses of preserving and maintaining the estate.

The Chancellor, in the eleventh paragraph of the final decree ordered that an account of the income from the assets of the estate from June 21, 1935, to the date of completing the taking of testimony and an account of the costs of preserving the estate be stated by the executors, crediting the widow with one-half the net income and debiting her with one-half the said costs and expenses.

This paragraph of the decree was erroneous in that it sought to divide the increment of the estate between the widow and the child before deducting the costs of maintaining and preserving the assets of the estate for that particular period. The expenses of maintaining and preserv-

ing the estate after decedent's death and prior to distribution of the estate should be paid from the profits arising from the assets of the estate during that period of time, and the remainder may then be divided between the widow and the child. See Henderson v. Chaires, 35 Fla. 423, 17 So. 589. The Court should have decreed further that of the remaining increase in the estate, the widow was to have one-third of the profits from the real property and one-half of the profits from the personal property.

The fifth question, raised by cross-assignment of error, is whether the widow's dower should be reduced by the amount of the decedent's indebtedness to residents of the State of New York.

The Chancellor, in paragraph 9 of the final decree, ordered that since decedent owned tangible personal property in the State of New York at the time of his death of considerable value and was indebted to resident creditors of the State of New York in a less amount, and that such debts were a charge upon said tangible personality, that the Special Master should not deduct from the widow's dower interest any part of said debts owed by decedent.

This part of the final decree is a correct interpretation of the law in view of our statute which provides that the widow's dower "shall be free from all liability for the debts of the decedent." Sec. (3630) 5494 C. G. L. For to hold otherwise would negative the clear intent and purpose of the statute. Inasmuch as paragraph 9 of the final decree was confined to tangible personalty of the decedent in the State of New York, review of that paragraph here is also confined to such kind of property.

The decree appealed from should be modified in the particulars enumerated herein so as to conform with the views expressed in this opinion.

It is so ordered.

WHITFIELD, C. J., and BROWN and DAVIS, J. J., concur.

TERRELL and BUFORD, J. J., concur in the opinion and judgment.

ELLIS, P. J., not participating.

ON PETITION TO RECALL MANDATE AND FOR LEAVE TO FILE PETITION FOR REHEARING.

PER CURIAM.—The holding of the court is that the purchase by the decedent in his lifetime of the stocks and securities referred to in the opinion, was subject to the broker's rights under the contract of purchase, and that the widow takes dower in the stocks and securities subject to · the broker's rights therein as the stocks, etc., were acquired by the husband subject to such rights. ·

A widow's rights in the proceeds of insurance policies on the life of her deceased husband are regulated by specific statutes. Sec. 7065 (4497) C. G. L.; Milam v. Davis, 97 Fla. 916, 123 So. 668.

The statute refers to the widow's statutory dower in personalty as being a "claim" or a "share," and the tax statute is held to refer to dower as well as to other shares in an estate in imposing estate taxes. See Sec. 5494 (3630) C. G. L.; Sec. 1342 (19) 1936 Supp. to C. G. L. 1927; Murphy v. Murphy, decided at this term.

Petition to recall mandate and for leave to file petition for rehearing denied.

WHITFIELD, C. J., and TERRELL, BROWN, BUFORD, and DAVIS, J. J., concur.