ESTATE of Kate B. LEGGETT, Deceased,
by Milton W. Leggett, Executor,
Appellant,

v.

UNITED STATES of America.

No. 17813.

United States Court of Appeals
Third Circuit.

Argued Oct. 10, 1969.

Dec. 2, 1969.

Robert G. MacAlister, Pittsburgh, Pa., (Frank E. Coho, Stanley M. Simon, Pittsburgh, Pa., on the brief), for appellant.

Stephen H. Hutzelman, Dept. of Justice, Tax Division, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Benjamin M. Parker, Attys., Dept. of Justice, Richard L. Thornburgh, U. S. Atty., Washington, D. C., on the brief), for appellee.

Before McLAUGHLIN, FORMAN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Before us is an appeal from the denial of a claim for refund of an estate tax. The district court held that a life bequest of personalty to Kate B. Leggett under the will of her husband, William T. Leggett, created a debtor-creditor relationship between the life tenant and remaindermen, thereby subjecting her estate to a tax on all increments to the value of her husband's bequest occurring from 1909, the date of his death, to 1960, when she died.[1]

Kate's executor, appellant in these proceedings, argues that by affirmative actions of the life tenant, she constituted herself as a trustee and not a debtor to the remaindermen. Thus, it is urged that the increases in the value of William's bequest passed directly to the remaindermen under his will, never having become a part of Kate's own taxable estate.

The apparatus of two trial courts, one state and one federal, have been employed to resolve this issue, with divergent results. The Orphans' Court of Allegheny County, Pennsylvania, in an estate proceeding of which the Commissioner had notice but in which he did not intervene as a party, held that "a debtor-creditor relationship did not exist at any time between Kate B. Leggett and the decedent's estate." Estate of Leggett, No. 913 of 1963.

■■■ Prior to the decision of the United States Supreme Court in Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), the judicial determination of the state trial court would have been binding in this circuit.[2] But by virtue of the Bosch holding, when the Commissioner is not a party to state proceedings involving the application of a federal statute, "the decision of a state trial court as to an underlying issue of state law should a fortiori not be controlling." 387 U.S. at 465, 87 S.Ct. at 1782. And, as in diversity cases, "the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." Id.

■■ Consequently, when appellant filed his claim for refund the district court was free to differ from the conclusion reached by the state court. And it did. Interpreting what it believed to be the Pennsylvania law as announced by the state supreme court, the district court held that the status of debtor-creditor "is thrust upon [the life tenant] by the very nature of the bequest, unless the terms of the will provide otherwise by naming him a trustee for the remainderman's interest or unless he petitions the court to appoint a trustee."

Our task is now to decide which of the diametrically opposed trial court decisions on the same subject would prevail under review by the Pennsylvania Supreme Court. Because our research

---

1. 26 U.S.C.A. § 2033, provides: "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."

2. Gallagher v. Smith, 223 F.2d 218 (3 Cir. 1955).

has uncovered no Pennsylvania case embodying a similar factual complex, we turn to the relevant fundamental principles which constituted settled decedent's estate law of Pennsylvania in effect at the time of testator's death.[3]

At the time of William's death in 1909, where a legal life estate was given without power of consumption, the life tenant received absolutely and as his own all the personal property given in the life estate, thereby creating a debtor-creditor relationship between himself and the remainderman for the value of the property actually received at the date of distribution. This amount, and only this amount, was payable to the remainderman upon the death of the life tenant.[4] "[T]he life tenant became a debtor to the remainderman in the amount originally received by the life tenant and the remainderman became a creditor of the life tenant or his estate for the value of the personalty when received."[5] By the enactment of legislation effective in 1909,[6] security was required to be given by the life tenant of personalty for the protection of the remainderman. The failure of the life tenant to post security did not, however, without more, convert the debtor relationship of the life tenant to that of trustee for the remainderman.[7]

This debtor-creditor relationship, although recognized as "a well established

although artificial rule of construction," was nonetheless "subject to the paramount rule that the intent of the testator must prevail, unless it is unlawful."[8] Moreover, the rule assumed no "intervention of or the creation of a trust" during the period of the life tenancy.[9]

It is also hornbook law in Pennsylvania that a legatee may renounce a legacy in its entirety or in part.[10] An express trust may be created by conduct and is enforceable.[11] Such a trust "must be created by clear and unambiguous language or conduct [and] cannot arise from loose statements admitting possible inferences consistent with other relationships."[12] A trust in personalty can be established by oral evidence "if it is sufficiently clear, precise and indubitable."[13]

Against the backdrop of these principles of Pennsylvania law we now examine the facts which were before the district court.

William T. Leggett's will, dated February 28, 1895, provided, in part:

"SECONDLY. I give, devise and bequeath unto my beloved wife KATE B. LEGGETT, all my estate, real, personal and mixed, of what nature and kind soever, and wheresoever the same may be at the time of my death;

---

3. Lyman's Estate, 366 Pa. 164, 76 A.2d 633 (1950).

4. Purnell's Estate, 424 Pa. 263, 226 A.2d 488 (1967).

5. Gramm's Estate, 420 Pa. 510, 218 A.2d 342, 345 (1966) (footnote omitted).

6. Acts of Feb. 24, 1834, P.L. 73 §§ 46, 49, of April 1869, P.L. 70, of May 17, 1871, P.L. 269.

7. Powell's Estate, 340 Pa. 404, 17 A.2d 391, 394 (1941). When the Pennsylvania legislature enacted the Estates Act of 1947, Act of April 24, 1947, P.L. 100 § 13, 20 Purd.Stat.Anno. 301.13, the previous rule of construction was abrogated and the life tenant was "deemed to be a trustee of such proprty, and not a debtor to the remainderman." The Estates Act is not, of course, applicable here because it

was not in effect at the time of William's death in 1909.

8. Sumney's Estate, 425 Pa. 224, 321, 228 A.2d 915, 919 (1967) (citations omitted).

9. Gramm's Estate, *supra*, note 5, 218 A.2d at 345.

10. Gallagher v. Smith, *supra*, note 2, 223 F.2d at 226; Bute's Estate, 355 Pa. 170, 49 A.2d 339 (1946). See Dutton's Estate, 301 Pa. 94, 151 A. 697 (1930).

11. 89 C.J.S. Trusts, § 11 (1955); Restatement (Second) of Trusts, § 24 (1965).

12. Bair v. Snyder County State Bank, 314 Pa. 85, 89, 171 A. 274, 275 (1934).

13. Haberland v. Haberland, 303 F.2d 345, 347 (3 Cir. 1962) (referring to the placing in trust of proceeds of a life insurance policy); Restatement (Second) of Trusts, § 24 (1965).

to have and to hold, for and during the term of her natural life.

"THIRDLY. Subject to the Life Estate of my said wife I give, devise and bequeath all my estate, real, personal and mixed, of what nature and kind soever, and wheresoever the same may be at the time of my death, to such child or children born to me of the body of said KATE B. LEGGETT, as shall then be living, share and share alike; to have and to hold, to them and to their heirs and assigns forever.

\*    \*    \*    \*    \*    \*

"And I do nominate, constitute and appoint my said wife, KATE B. LEGGETT, sole Executrix of this my Last Will and Testament."

Upon the death of her husband, Kate took possession of the residuary estate, consisting of certain securities. An inventory was prepared by her but never filed. No bond was obtained and she made no effort to obtain a decree of distribution in her favor. She held these securities solely in the name of Kate B. Leggett, in her capacity as Executrix of the Estate of William T. Leggett, and kept a complete set of books in this name, recording therein all activity relating to these securities. All stock splits and dividends were credited to and registered in the name of the estate of her husband. In the nearly fifty-one years from the death of her husband until her own death in 1960, she meticulously kept the estate portfolio separate from other substantial properties of her own. When a stock dividend or split occurred, she made no attempt to determine if an event requiring apportionment between principal and income had occurred. She made no effort to make an apportionment between herself as an individual and the estate. To the contrary, she credited all stock splits and dividends to the estate principal, both in the special estate account book and in the official registration records of the issuing corporations.

In the half-century of her widowhood, Kate's only withdrawals from the residuary estate of her husband consisted of most, but not all, of the income from the personalty. There was no withdrawal of principal, at any time. There was no instance during this extensive period when she exercised dominion or control indicating absolute ownership of the principal of the residuary estate or the accumulations thereto.[14] Indeed, the district court was fully persuaded that she "did not regard the principal as her property; and that she managed it for the benefit of the remaindermen." In 1909 the value of the residuary estate was $41,372.87. At Kate's death the assets derived from William's estate had a net value of $319,351.16. The Commissioner imposed an estate tax on the increased value of some $286,000.00.

■ Under these circumstances we conclude that it was improper to impose the estate tax on the increments. We hold that by her conduct the life tenant renounced and disclaimed the rights of dominion, control, and ownership of which she could have availed herself in a debtor-creditor relationship, and that she constituted herself a fiduciary for the remaindermen with their full consent. Five decades of conscientious, painstaking segregation of the residuary estate of her husband, preserving at all times the integrity of its principal, adding to this corpus, with unfaltering fidelity, such accretions from stock dividends and splits as occurred over the

---

14. See Fulk & Needam, Inc. v. United States, 411 F.2d 1403, 1405 (4 Cir. 1969): "There is no evidence that [the executrix] appropriated the corpus of the trust to her own use, or otherwise acted in a manner at odds with the continued existence of the remainderman's rights under the testamentary trust. The trusts interest \* \* \* has not been invaded by the life tenant, remains entirely intact, and will be available to the life tenant's daughters at her death, all in strict accordance with the direction in [the] Will. Unquestionably, the daughters, at the termination of their mother's life estate, will not inherit from her, but will take under their father's Will."

decades, preserving the official registration of these securities and additions thereto in the name of the estate, and withdrawing for herself only the income, all was conduct pointing unerringly to the conclusion that Kate Leggett established herself as a self-appointed trustee for the remaindermen.

In reaching this conclusion, we apply the test vigorously pressed by the government: "[a] trust must be created by clear and unambiguous language or conduct; it cannot arise from loose statements admitting possible inferences consistent with other relationships."[15] The language in both the recordation of the books maintained by Kate and in the official registration of the securities was consistent only with that of a fiduciary. Her conduct in refusing to avail herself of any of the principal or accretions thereto was equally consistent, and wholly inconsistent with a debtor-creditor relationship. As Judge Cox of the Orphans' Court observed: "It is manifest from this conduct over the fifty-one years in which she had the decedent's estate in her possession, that she intentionally waived her right as income beneficiary to apportionment of stock dividends and splits."

Although it is true that Kate did not formally petition the court for the appointment of a trustee, as was done in Loewer's Estate, 263 Pa. 517, 106 A. 789 (1919), still we are completely satisfied that appellant has met the test, suggested by the government, of proving an oral trust "by evidence which is direct, positive, express and unambiguous," Brunier v. Stanert, 369 Pa. 178, 183, 85 A.2d 130, 133 (1952), "definite, clear and explicit and embody[ing] all the essential elements" of a trust, Gribbel v. Gribbel, 341 Pa. 11, 13 14, 17 A.2d 892, 894 (1941). "In the creation of Trusts settlors have never been handicapped by formalism." Bogert on Trusts and Trustees, 293; In Bair v. State Bank, *supra*, note 12, 171 A. at 275.

In reaching our conclusion, we recognize that the conduct of the remaindermen, as well as that of the life tenant, assumes no little significance, especially when all are members of the same family who agree on the interpretation of the will. In the latest Pennsylvania case examining a pre-1947 life bequest of personalty, Sumney's Estate, 425 Pa. 224, 228 A.2d 915 (1967), the bequest of personalty was to the testator's widow "to

---

15. Bair v. State Bank, *supra*, note 12, 171 A. at 275.

See United States v. Rose, 346 F.2d 985 (3 Cir. 1965) in which the government urged the theory that a trust was created by an administrator's conduct. Such a finding was necessary to avoid the intervention of the statute of limitations which would have applied had the administrator been a debtor to the government, instead of a trustee for its funds. There was no trust instrument and no court proceeding designating the executor as trustee for the government. The administrator had asked for a reduction in the estate bond to $20,000.00, saying that the only remaining obligation of the estate was the payment of the federal estate tax, the exact amount of which was undetermined but would not exceed $10,000.00, and that the "amount of security so heretofore filed is in excess of any amount required to meet any exigency of their *trust*." (Emphasis supplied.) We found that when the administrator asked for the reduction and the court expressly approved the petition, the legal consequences were "(1) an express declaration of trust for the benefit of the United States Government; (2) a distribution of those particular funds of the estate by them as administrators to themselves as trustees for the United States."

Although our decision in *Rose* does not have precise precedential effect on the case at bar because of the factual dissimilarities, the case is important in illustrating the type of circumstances under which the government has argued and this court has found a trust relationship under Pennsylvania law. And such a conclusion was reached with this court recognizing the standard articulated in Bair v. State Bank, *supra*, note 12, 171 A. at 275, emphasizing that such a trust must be created by "clear and unambiguous language or conduct" and not "from loose statements admitting possible inferences consistent with other relationships," cited in Sherwin v. Oil City Nat'l Bank, 229 F.2d 835, 839 n. 13 (3 Cir. 1956).

hold during her life or while she may remain my widow," with the provision that "[a]t her death or remarriage, all of said property shall revert to my children." In assessing the status of the life tenant under this provision, the court attached critical importance to two factors. First, the use of the word "revert" necessarily implied that the widow had not received an absolute estate placing her in a debtor-creditor relationship, and second, the life tenant and remaindermen agreed that the will created a trust relationship between them.

We believe that this second factor is equally weighty in the present case, even though no formal family agreement was executed. By affidavits filed in the district court, both remaindermen stated that they "agreed to what our Mother did with the estate * * * accepted the arrangement * * * and never tried to change it." In this respect, the state court specifically noted: "No objection was made at any time by the remaindermen to the manner in which she administered the decedent's estate during the fifty-one years during which it was in her possession."

The formidable array of cases offered by the government in support of its position are inapposite. None approaches a factual composition which encompasses the circumstances contained in the case at bar, involving a course of consistent, undeviating conduct spanning five decades.[16]

The judgment of the district court will be reversed and judgment entered in favor of the plaintiff.

16. In Purnell's Estate, *supra*, note 4, for example, the life tenant obtained a decree of distribution in her name. The securities were registered in her name, and in an income tax return she listed as part of her income a capital gain realized on the redemption of certain of the preferred stock. This case found that a debtor-creditor relationship existed, and was decided only four months before Sumney, *supra*, which reached a contrary result. Chief Judge Bell wrote both opinions.

The only similarities between the instant case and Powell's Estate, *supra*, note 7, are that in *Powell* no bond was given and no distribution to the life tenant was made. None of the other elements of Kate's course of conduct were present there. And in Gillett's Estate, 130 Pa. Super. 309, 197 A. 517, 519 (1938), the court found that the life tenant handled the property of the estate as her own. She "received and enjoyed the income and increment [from the securities] as her own property."