ESTATE OF EVA M. MILLER, DECEASED, JOHN L. ESTES, ADMINISTRATOR CUM TESTAMENTO ANNEXO, AND CHARLES R. MILLER, EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4312–70.   Filed July 31, 1972.

---

[3] According to petitioner's reply brief, the additions to tax under secs. 6651(a) and 6653(a) are conceded by petitioner.

*Milton F. Cooney,* for the petitioners.
*Gary F. Walker,* for the respondent.

STERRETT, *Judge:* Respondent determined a deficiency of $35,917.94 in the estate tax due from the Estate of Eva M. Miller, deceased. This Court is to decide whether there is includable in the above-named estate, under section 2033,[1] an unpaid bequest from the deceased's husband. We must also decide whether the income generated and retained by the husband's estate and a testamentary trust established thereunder was payable to Eva M. Miller, and, if so, whether Eva M. Miller in effect made a transfer of such income within the meaning of sections 2036 and 2038.

### FINDINGS OF FACT

All of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.[2]

Petitioners are John L. Estes and Charles R. Miller, who are administrator c.t.a. and executor, respectively, for the Estate of Eva M. Miller, deceased. At the time of filing the petition herein John Estes was a resident of Clearwater, Fla., and Charles R. Miller was a resident of Pontiac, Mich.

Eva M. Miller (hereinafter referred to as Eva) died in Pontiac, Mich., on February 9, 1966, at the age of 76. A Federal estate tax return was filed with the district director of internal revenue, Jacksonville, Fla., on or before May 5, 1967.

Eva's husband, Charles O. Miller (hereinafter referred to as the husband or testator), predeceased Eva on September 29, 1961. Charles O. Miller died testate, and his will was filed for probate in the Court of County Judge In And For Pinellas County at Clearwater, Fla.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[2] Some of the stipulated documents contain irreconcilable differences with respect to figures. In such instances our findings reflect our best efforts to extract the correct figures from this melange.

In addition, an ancillary proceeding was filed in the Probate Court for Oakland County at Pontiac, Mich. Eva was appointed executrix for the Florida probate proceeding and Charles R. Miller was appointed administrator with will attached in the Michigan ancillary proceeding. Prior to her death, Eva had been appointed, by the appropriate courts in Florida and Michigan, as cotrustee of a trust established by the will of Charles O. Miller. Eva held the positions of executrix of the Florida estate and cotrustee of the trust until her death.

Those segments of Charles O. Miller's will, executed November 16, 1959, relevant to the present case state as follows:

### FIRST

I direct that all my just debts and costs of administration of my estate be paid by my Executrix, hereinafter named, as soon as convenient after my death. I further direct that any and all estate and inheritance taxes shall be payable from the residuum of my estate, provided, however, that if my wife, EVA M. MILLER, survives me, the same shall be payable solely out of Share "B" as hereinafter provided.

### SECOND

I hereby give and devise Lot 72, Shore Acres Subdivision, situate in Novi Township, Oakland County, Michigan, to my Trustees, hereinafter named, SUBJECT, HOWEVER, to a life estate in my brother, PHILEMON J. MILLER, for and during the term of his natural life ONLY; it being my will that my brother, Philemon J. Miller, shall have the income from the above described real estate for and during the term of his natural life.

### THIRD

Provided that my wife, EVA M. MILLER, survives me, all the rest, residue and remainder of my estate shall be divided into two (2) equal shares hereinafter called "A" and "B," which I dispose of as follows:

1. I give, devise and bequeath Share "A" to my wife, EVA M. MILLER, to be hers absolutely.

2a. Out of Share "B" there shall first be payable any and all expenses of my estate including but not limited to, all estate and inheritance taxes which may accrue by reason of my death.

2b. The remainder of Share "B" after payment of the items specified in 2a of this Paragraph, I give, devise and bequeath to my Trustees, hereinafter named, to be held in trust upon the following terms and conditions, to-wit:

i. During the life of my wife, EVA M. MILLER, to pay to her all of the income of this trust.

\*   \*   \*   \*   \*   \*   \*

iii. During the life of my wife, EVA M. MILLER, I empower my co-trustee, CHARLES R. MILLER, acting alone as such co-Trustee, to pay to my said wife, Eva M. Miller, such part or parts of the principal as my said co-Trustee, Charles R. Miller, may determine to be necessary to be paid to her for her care, maintenance and support, in addition to any other income she may have from any other source whatsoever. My said wife, Eva M. Miller, shall have no power or right to invade the corpus of this trust, either by her own act as Trustee, or by her acting jointly as Trustee with my co-Trustee, Charles R. Miller.

3a. Upon the death of my wife, EVA M. MILLER, this trust shall terminate as to a two-thirds (⅔) part thereof and I direct my remaining Trustee to distribute two-thirds (⅔) of the principal of this trust, including any and all accumulated and undistributed income to the aforesaid CHARLES R. MILLER and PHYLLIS A. THOMPSON. * * *

3b. Commencing immediately upon the death of my wife, EVA M. MILLER, I direct my remaining Trustee to pay to my brother, PHILEMON J. MILLER, the income from the remainder of one-third (⅓) of the trust for and during the term of his natural life.

3c. Upon the death of my brother, PHILEMON J. MILLER, the remainder of this trust shall terminate and I direct my remaining Trustee to distribute all amounts held by him, including principal and accumulated income then held by him, to the aforesaid Charles R. Miller and Phyllis A. Thompson. * * *

## FOURTH

I nominate, constitute and appoint my wife, EVA M. MILLER, and the aforesaid CHARLES R. MILLER, to be the Trustees of the trust created in Paragraph THIRD of this, my Last Will and Testament, granting unto my said Trustees full power to do everything in the administration of the trust that they deem to be for the best interest of the beneficiaries, specifically including the following:

(a) All of the powers granted to Trustees by the statutes of the State of Florida.

\* \* \* \* \* \* \*

(c) I direct my Trustees to retain all of the General Motors Corporation stock, common or preferred, received by them as such Trustees under this, my Last Will and Testament, until the trust herein created is terminated, and such retention shall be mandatory under the terms of this trust.

\* \* \* \* \* \* \*

(e) To apply any sum of income or principal payable to the life beneficiary of the trust who, in the judgment of my Trustees, is incapable of making a proper disposition thereof by any one or more of the following methods:

(1) By payments on behalf of the beneficiary to anyone with whom the beneficiary resides.

(2) By payments in discharge of the beneficiary's bills or debts.

(3) All without regard to other resources of the beneficiary and without like fiduciary, or without obligation to see to the further application thereof.

\* \* \* \* \* \* \*

## SIXTH

In the event my wife, EVA M. MILLER, does not survive me, then I give, devise and bequeath all the rest, residue and remainder of my estate, * * * to the aforesaid CHARLES R. MILLER and PHYLLIS A. THOMPSON, in equal shares, share and share alike. * * *

## SEVENTH

I hereby nominate, constitute and appoint my wife, EVA M. MILLER, as Executrix * * *.

I hereby give and grant unto my said Executrix full power and authority to sell and dispose either at public or private sale, all my property * * * without obtaining an order of the Court, the said sale to be made by my Executrix at such price and upon such terms and conditions as my Executrix shall, in her discretion, determine to be for the best interest of my estate.

The fiduciaries for the Charles O. Miller estate in Florida and in Michigan inventoried his probate assets at a total value of $1,275,199. The inventory filed with the Florida probate court reflected the decedent's personal property and the inventory filed with the Michigan probate court his real property. Based upon an income tax return filed for the taxable period ending with Charles O. Miller's death, the estate of Charles O. Miller in 1962 received an income tax refund in the amount of $6,808.62. Although the amount of the refund was treated as an asset in the estate of Charles O. Miller, it was not accounted for in the inventoried assets as of September 29, 1961. The total probate value of the estate of Charles O. Miller at his date of death, including the total inventory and the tax refund, was $1,282,007.62.

On March 30, 1965, Eva filed in the Court of County Judge a final return and proposed plan of distribution for the Charles O. Miller Florida estate. The final accounting was approved in an order of the Court of County Judge dated May 10, 1965, and the proposed distribution was approved in an order dated July 1, 1965. In the petition submitting the final account and the proposed distribution there was a statement signed by Eva, both as executrix and individually, in which she approved and consented to the proposed plan of distribution. The proposed plan indicated that the income of the estate from dividends was to be distributed to the trust created by Charles O. Miller's will (sometimes hereinafter referred to as the Share B Trust). An order allowing the final account of the Michigan estate and ordering a distribution of its assets was handed down by the Probate Court for the County of Oakland on October 20, 1964.

In satisfaction of Eva's "Share A" bequest under the will of Charles O. Miller, property having a probate value of $632,224.50 was distributed to her. Of this amount $396,000 worth was represented by 8,000 shares of General Motors common stock distributed in 1962, and $128,581 worth was represented by Michigan real estate and a small amount of cash distributed in 1964. The balance of $107,643.50 was distributed after Eva's death and pursuant to the plan of distribution approved in 1965. This last distribution represented 2,174 shares of General Motors common stock and a small amount of cash.

From the date of Charles O. Miller's death until October 19, 1964, the Michigan estate generated gross income of $9,669. In October 1964 part of the Michigan estate was distributed to Eva under paragraph Third (1) of the will and the balance was placed in the Share B Trust. The Michigan assets in the Share B Trust earned gross income of $5,926.24 up to February 9, 1966, the date of Eva's death. During these same periods the Michigan estate and the trust incurred expenses chargeable to income in the amounts of $20,439.13 and $10,020.39 respectively.

During the period September 29, 1961, to February 9, 1966, the

Florida estate earned gross income totaling $205,661.74. The Florida estate during this same period incurred expenses chargeable to income in the amount of $83,845.74. The expenses charged to income included Federal income taxes, social security taxes, State intangible taxes, and a small amount of miscellaneous expenses. The Florida estate income was also reduced by the $14,864.28 deficit of the Michigan estate and trust. The only income distributed from the Charles O. Miller estate was $6,522 paid to Eva's estate sometime after January 1967. This amount was paid out of dividends earned during the period of July 1 through December 31, 1965. Allowing for this distribution, the accumulated net income in the Charles O. Miller estate as of February 9, 1966, was $100,439.95. Of this amount, $5,075.71 was accumulated after July 1, 1965. The cash representing the net income was utilized in the payment of the estate administration expenses. Approximately 75 percent of these expenses were State inheritance and Federal estate taxes.

A final return and proposed plan of distribution submitted by Eva as executrix of her husband's estate reflected the fact that the beginning inventory of the husband's Florida estate was $1,007,287, and contained the following plan of distribution which was approved by the Court of County Judge:

### Proposed Plan of Distribution

(1) To Eva M. Miller, beneficiary of Equal Estate A:

| | |
|---|---:|
| (a) 8,000 shares, common stock, General Motors Corporation, per order of partial distribution | $396,000.00 |
| (b) 2,174 shares, common stock, General Motors Corporation, at 49½, the inventory value | 107,613.00 |
| (c) Cash | 30.50 |
| Total | 503,643.50 |

(2) To Testamentary Trustee under Will of Charles O. Miller, Deceased, beneficiary of residue of Equal Estate B:

| | |
|---|---:|
| (a) Equal Estate B | 503,643.50 |
| (b) Plus income from dividends, interest refunds, etc., other than sale of capital assets | [1] 178,156.12 |
| (c) Plus advances by Eva M. Miller | 92,348.08 |
| Total receipts to Estate B credit | 774,147.70 |
| Less expenditures, taxes, etc | [2] —337,190.91 |
| Gross to trust account | 436,956.79 |
| Includes cash advance returnable to Eva M. Miller | —52,348.08 |
| Actual net trust estate | 384,608.71 |

[1] This is a gross income figure unreduced by expenses attributable to income as of the end of 1964.

[2] This amount includes $64,078 in expenses chargeable to income.

Before a distribution of the Florida estate was effected, Eva died. An administrator was appointed for the husband's estate. The administrator carried out the proposed plan of distribution, and in January of 1967 submitted an accounting which contained the following:

SUGGESTED PLAN FOR DISTRIBUTION AND ALLOCATION OF INCOME AND EXPENSES

| | | |
|---|---:|---:|
| To Eva M. Miller Estate, per order of of July 1, 1965_ | $503, 643. 50 | |
| Plus dividends 2174 shares GMC common stock— 7/1/65–12/31/65 _____ | 6, 522. 00 | |
| Plus dividends 2174 shares GMC common stock, 1966 _____ | 1, 847. 90 | |
| | 512, 013. 40 | $512, 013. 40 |
| Distributed to Eva M. Miller Estate: | | |
| 8000 shares GMC common stock_____ | 396, 000. 00 | |
| 2174 shares GMC common stock_____ | 107, 613. 00 | |
| Cash _____ | 30. 50 | |
| | 503, 643. 50 | 503, 643. 50 |
| Balance due Eva M. Miller Estate_____ | | 8, 369. 90 |
| To Charles O. Miller Trust, per order July 1, 1965_____ | | 436, 956. 79 |
| Income receipts, 1/1/65–7/1/65_____ | 23, 126. 32 | |
| Income receipts, 7/1/65–12/31/65, less portion payable to Eva M. Miller_____ | 24, 292. 29 | |
| Income receipts, 1966, less portion payable to Eva M. Miller Estate_____ | 6, 893. 96 | |
| | 54, 312. 57 | 54, 312. 57 |
| Total _____ | | 491, 269. 36 |
| Less expenses chargeable to trust share_____ | | 26, 808. 80 |
| Balance _____ | | 464, 460. 56 |
| Distributed to trust_____ | | 443, 700. 88 |
| Balance due trust_____ | | 20, 759. 68 |

During the course of the administration of her husband's estate, Eva advanced $92,348.08 for the payment of taxes and administration expenses. Of this amount $40,000 was repaid her prior to her death and the balance was included in her estate as an obligation due her from her husband's estate.

As of February 9, 1966, there were on hand in the Charles O. Miller estate and trust assets having a September 29, 1961, probate inventory value of $707,107.90. These assets were reduced by the $107,643.50 Share A distribution to Eva's estate. The assets were subject to a further reduction in the amount of $93,784.01 for items chargeable to either income or corpus but remaining unpaid as of February 9, 1966. Accordingly as of February 9, 1966, the total amount of assets, at pro-

bate inventory value, available to fund the Share B Trust under the will of Charles O. Miller equaled $505,680.39.

The administrator and executor of the Estate of Eva M. Miller elected under section 2032 to have the gross estate valued on February 9, 1967, rather than the date of Eva's death. The February 9, 1967, value of the assets in the Charles O. Miller estate available to fund the Share B Trust was $865,301.82.

In a statutory notice dated April 29, 1970, respondent increased Eva's gross estate in the amount of $5,317.50 on account of unpaid bequests allegedly due from Charles O. Miller's estate. Respondent also increased Eva's estate by $155,302.61 as representing the value of a transfer by her with retained interests and powers of the accumulated interest of the Charles O. Miller estate to the Share B Trust.

#### OPINION

This case presents two questions for decision. The first question is whether Eva M. Miller, as of the date of her death, was entitled to receive an unpaid bequest from the estate of Charles O. Miller who had been her husband. Such an unpaid bequest would be includable in Eva's estate under section 2033.[3]

The husband died on September 29, 1961. The total value of his estate, including a refund of 1961 income taxes received in 1962, was $1,282,007.62. The will of Charles O. Miller divided his estate into two "equal" shares called A and B. Share A was given to Eva "absolutely" and unreduced by expenses. One-half the husband's estate equaled $641,003.81, ultimately, but only property having the value of $632,-224.50 was distributed to Eva. The difference in the amounts is $8,779.31. Respondent, in the statutory notice determined an addition to the gross estate under this issue in the amount of $5,317.50 only, and in his brief specifically disavowed any claim for an amount in excess of this.

Petitioners concede that the refund of 1961 taxes in the amount of $6,808.62 should have been included in the husband's estate, and that one-half of it represents an unpaid bequest due the Estate of Eva M. Miller. As to the remaining $1,913.19 contended for by respondent, petitioners have failed to offer evidence or argument as to why it should not also be included in Eva's gross estate as a result of her husband's will. The burden rests with petitioners to overcome the presumptive correctness of respondent's determination. Rule 32, Tax Court Rules of Practice. This has not been done. Consequently we conclude that re-

---

[3] SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

spondent properly increased Eva's gross estate in the amount of $5,317.50.

Next we consider whether Eva was entitled to any part of the net income earned by the Charles O. Miller estate, and if so whether her failure to draw down that income constituted such a transfer to a trust established under the husband's will that some portion of that trust must be includable in Eva's gross estate. If a portion of the trust is found includable, then the amount of the addition on that account must be determined.

From the time of Charles O. Miller's death, on September 29, 1961, until Eva's death, on February 9, 1966, the assets in the husband's estate earned net income in the amount of $106,961.95. Petitioners admit and the record shows that this income was used to pay administrative expenses of the husband's estate except for $6,522 distributed to Eva's estate.

Respondent's main theory is that Eva was entitled to most of this income, and by not collecting it, but rather allowing it to be used for administrative expenses, she effectuated a transfer of the money to a residuary trust established under the will of Charles O. Miller. Since Eva was life income beneficiary of that trust, respondent argues that she, in effect, made such a transfer as to cause the value of the property transferred to be included in her gross estate by force of section 2036(a)(1).[4]

Before it can be determined whether Eva made a transfer, it must be ascertained whether she had anything to transfer, and, if so, how much. To answer this threshold inquiry we must look to the relevant State law for it is that which answers questions as to the ownership of property by a decedent. *Morgan* v. *Commissioner*, 309 U.S. 78, 80 (1940) ; *Aldrich* v. *United States*, 346 F. 2d 37, 38–39 (C.A. 5, 1965). Consequently we turn our attention to the question of whether under the law of Florida [5] Eva was entitled to the income earned by the Charles O. Miller estate during its administration. Consideration of this phase of the question should start with a determination of what Charles O. Miller intended to achieve by his will.

As is usual, Charles O. Miller provided in the first paragraph of his will that all his debts and the expenses of his estate be paid, and

---

[4] SEC. 2036(a). GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property * * *

[5] The impact of Michigan law is a moot point because the Michigan estate during all times relevant generated net losses.

then added that "Share B" be the source of the payment of taxes, which item constituted the great bulk of the expenses of the estate. With respect to the distribution of his property the testator provided that his brother should have a life estate in a small piece of real estate in Michigan. All the rest of the husband's estate was divided into two equal parts. The first part, designated "Share A," was given to Eva outright, and unreduced by any expenses of the estate. The other half was to be placed in "Share B." The will again directed that there be paid out of Share B "all" the expenses of the estate, and that the balance of Share B remaining after payment of expenses be held in trust "During the life of my wife EVA M. MILLER, to pay to her *all* of the income of this trust." (Emphasis supplied.)

The primary guidance in construing a will is the testator's intent. *Mosgrove* v. *Mach*, 133 Fla. 459, 182 So. 786, 791 (1938). To determine a testator's intent, a court is to take the entire instrument by its four corners, and consider all its parts rather than merely isolated segments. *Meszaros* v. *Holsberry*, 84 So. 2d 565, 567 (Fla. 1956). Each provision of the will should be read together as part of a general plan. *In re Parker's Estate*, 110 So. 2d 498, 501 (Fla. App. 1959). Our reading of Charles O. Miller's will leads us to conclude that Eva's right to the income from Share B vested as of the testator's death, and, accordingly, that the expenses of administration be paid out of the assets of Share B. The fact that the executrix was entitled to immediate possession of all the estate's assets and was required to pay all the just debts of the estate before any final distribution has no bearing on the source of the funds used to pay the debts nor for whose ultimate benefit the income is accruing.

Initially it should be noted that Eva was Charles O. Miller's wife, and thus quite naturally the primary object of his beneficence. The surviving spouse, it has been said, is a favorite of the law in the construction of a will. *In re Roger's Estate*, 180 So. 2d 167, 171 (Fla. App. 1965). Accordingly the will here under consideration should be construed in a maner which recognizes the preeminent position of Eva as the testator's widow.

Eva was virtually the only current beneficiary under the will. She was to get Share A outright, unreduced by expenses, for the obvious reason that this would provide the largest Federal estate tax marital deduction. See sec. 2056. Every dollar saved by means of the marital deduction accrued to the benefit of Eva. In this regard the burden of administrative expenses placed on Share B was not contrary to Eva's larger interests under the will, although she was also income beneficiary of Share B. Share B, it is apparent, was burdened with administration expenses out of solicitude for Eva, thereby showing that

Charles O. Miller, in devising his testamentary plan, was thinking of his wife first.

Under paragraph Third (2b) (iii) of the will, the cotrustee of the Share B Trust had a right to invade corpus for the benefit of Eva as income beneficiary when the cotrustee thought it necessary for the care, maintenance, and support of Eva, regardless of whatever income she may have had from any source. Paragraph Fourth (e) of the will authorized the trustees to apply any income or principal payable to Eva for her support in the event she became incapacitated. These provisions further indicate a strong solicitude by the testator for Eva, this time in her status as income beneficiary. This is particularly true of the last-mentioned provision where Charles O. Miller anticipates incapacity of his wife probably as a result of old age. At the time Charles O. Miller executed his will Eva was 69 years old.

Under paragraph Sixth of the will, the remaindermen of the Share B Trust are named as contingent beneficiaries of the Charles O. Miller estate, to take outright in the event Eva did not survive her husband. This clearly indicates that the remaindermen stand second as subjects of Charles O. Miller's beneficence. But it is they who would be favored if it were determined that Eva's income interest in Share B did not vest at the death of the testator.

Petitioners call our attention to paragraph Fourth (c) of the husband's will which directs the trustees to retain all the General Motors stock received by them as trustees. The contention is that this implies income should be used for expenses so no General Motors stock need be sold. This direction was to apply only after the trust was funded, because it is only then that the trustees, as such, could have received legal title to the General Motors stock. In the meantime the executrix had been directed that "Out of Share 'B' there shall first be payable any and all expenses of my estate." Additionally paragraph Seventh of the will gave the executrix full power to sell, at her discretion, any of the assets of the husband's estate.

Charles O. Miller's will in paragraph Third (3a) directs that upon the death of Eva there be distributed "Two-thirds (⅔) of the principal of this trust, including any and all accumulated and undistributed income" to the remaindermen. As we have heretofore noted a testator's intent is ascertained, not by a consideration of an isolated segment of a will, but by reference to the whole instrument. *Meszaros* v. *Holsberry*, *supra*. There are no provisions in the Share B Trust specifically authorizing accumulations, prohibiting alienation of the income interest, or giving the trustees discretion over the amount of income to be paid Eva, indeed the instrument stated Eva was to be paid "all the income of this trust." Under these circumstances it cannot be said it

was the intent of the testator to deprive Eva of any of the income. *Philp* v. *Trainor*, 100 So. 2d 181, 187 (Fla. App. 1958). At most the distributory language can be construed as giving the remaindermen all income not paid as of the life beneficiary's death. We have found no Florida cases dealing with the directions found in paragraph Third (3a) of the will. Nonetheless, courts of other States have construed such language as not denying the estate of a deceased life beneficiary income accumulated to his death, especially where the instrument in question exhibits a strong solicitude for the life beneficiary. E.g., *Commercial Trust Co.* v. *Spiegelberg*, 117 N.J. Eq. 171, 175 Atl. 164 (1934); *In re Kenny's Estate*, 393 Pa. 30, 141 A. 2d 839 (1958); 3 Scott, Trusts, sec. 235A; Note, 141 A.L.R. 1466, 1469. Thus we conclude that the reference to the distribution of income accumulations to the remaindermen did not diminish Eva's rights as income beneficiary of the Share B Trust.

We are not unaware of the apparently conditional language as to the funding of the Share B Trust. Specifically paragraph Third (2a) states that "out of Share 'B' there shall first be payable any and all expenses of my estate." Then paragraph Third (2b) provides that the balance of Share B "after payment" of the expenses will be placed in trust with "all" the income payable to Eva for life. As with any other language in a will, an apparent condition precedent must be construed in the context of the entire will. *In re Martin's Estate*, 110 So. 2d 421 (Fla. App. 1959).

Since Eva was the primary object of her husband's testamentary plan, there appears to be little reason to believe that Charles O. Miller intended his wife's income interest to be contingent upon and to begin with the funding of the Share B Trust. As noted, placing the burden of expenses on Share B was ancillary to maximizing the size of Share A. Charles O. Miller's estate was sizable, and he died approximately 2 years after making the will in question. We can safely assume that the testator, at the time he executed his will, anticipated that there would be an ample amount to fund the Share B Trust without using income earned during administration for the payment of expenses. Of course it should be noted that the will contains no provision to the effect "I direct income earned by my estate during administration be used for payment of the expenses of my estate."

To the extent that the language of paragraph Third (2a) and (2b) can be viewed as imposing a condition precedent to Eva's income interest under her husband's will, such condition must be construed as quantitative and not temporal. Certainly the precise amount of Share B Trust corpus could not be determined until the expenses had been paid and the estate settled. It appears to be the rule in

Florida that the income earned during administration attributable to assets sold to pay expenses is an addition to the principal of the residue. *In re Brown's Will*, 16 Fla. Supp. 120, 122–123 (County Judge's Ct. 1960). Accordingly the exact amount of income earned during the period of administration due a beneficiary of a testamentary trust cannot be determined until it is ascertained which assets will be untouched by the burden of expenses. This would occur when the estate is finally settled and the trust funded. That the exact amount due an income beneficiary of a testamentary trust cannot be immediately determined is not a block to the interest vesting at the date of the testator's death. *Risolia* v. *First National Bank of Miami*, 224 So. 2d 714 (Fla. App. 1969), certiorari denied 234 So. 2d 119 (Fla. 1969).

If the language of paragraph Third (2a) and (2b) is read as imposing a prior condition to the income interest, then such condition, we think, would be inconsistent with the import of the husband's testamentary plan. Courts are to make every effort to resolve apparent inconsistencies in light of the testator's intent revealed by the entire will. *In re Smith's Estate*, 75 So. 2d 686 (Fla. 1954). Once the intent of a testator has been ascertained, the language of a will is to be given such liberal construction as to effectuate the testator's intent. *In re Williams' Estate*, 59 So. 2d 13 (Fla. 1952). Thus, construing the entire will as to the testator's intent, we conclude that the testator meant for Eva's income interest in Share B to vest at his death and that she is entitled to the income earned from the date of his death.[6]

Petitioners direct our attention to Fla. Stat. Ann. sec. 733.01(1) (1967) where it states:[7]

---

[6] Fla. Stat. Ann. sec. 731.21 (1967) provides:

The death of the testator is the event which vests the right to legacies or devises unless the testator in his will has provided that some other event must happen before a legacy or devise shall vest.

[7] The balance of this section deals with the disposition of income earned during administration, and in pertinent part provides:

(2) The net income earned by the assets of the estate after the death of the testator, and prior to the distribution of the estate, and not used for the purposes set forth in subsection (1) [previously set forth] above shall in the absence of specific provision in the will to the contrary be paid and applied as follows:

(a) To either specific or demonstrative legatees and devisees the net income from the property specifically or demonstratively bequeathed and devised to them respectively;

(b) To general legatees, legal interest on their respective legacies from the time fixed by the county judge in an order of distribution for the payment thereof, or if no date is fixed by the county judge, from and after thirty days from the entry of such order of distribution, except that where the general legacy provides that the net income therefrom shall be paid to or for the benefit of or accumulated for one or more beneficiaries, then such general legatee or legatees shall be entitled to that proportion of the net income which the general legacy at appraised value bears to the appraised value of the entire probate estate, excluding specific and demonstrative legacies and devises * * *;

(c) To the residuary legatees and devisees, all the rest and remainder of the net income earned after the death of the testator not hereinabove applied.

(3) If any part of the estate is bequeathed or devised to a trustee the proportion of the net income applied to such bequest or devise shall be paid by the executor to such trustee and shall be held and distributed by the trustee as income.

(4) This section shall apply to estates of all decedents dying on or after July 1, 1953.

The personal representative shall take possession of the personal property wheresoever situate of a person who hereafter dies a resident of the state * * *. All such property and the rents, income, issues and profits therefrom shall be assets in the hands of the personal representative for the payment of legacies, debts, family allowance, estate and inheritance taxes, claims, charges and expenses of administration, and to enforce contribution and to equalize advancement and for distribution.

Petitioners argue that this provision gives an executor the unrestricted right to use income generated by an estate. They contend that nothing in the husband's will abrogates or limits that ostensible right, and that the income was in fact used for the payment of expenses, which use was implicitly condoned by the Court of the County Judge in an order approving a final accounting and proposed distribution of the Charles O. Miller estate.

We have concluded from an examination of the will that the testator intended Eva's income interest to commence upon his death. In *Ballantine* v. *Tomlinson*, 293 F. 2d 311 (C.A. 5, 1961), after an examination of Florida law, it was concluded that there is "nothing in the Florida statutory law requiring the payment of administration expenses from estate income." Where a will is construed as providing an income interest to a beneficiary of a testamentary trust, the beneficiary is entitled to income from the date of the testator's death. *Risolia* v. *First National Bank of Miami, supra; In re Will of Bowen*, 240 So. 2d 318 (Fla. App. 1970) ; *In re Merrill's Will*, 11 Fla. Supp. 48 (County Judge's Ct. 1957) ; see *In re Kent's Estate*, 23 Fla. Supp. 133, 135–136 (County Judge's Ct. 1964). Under such circumstances the income of the estate is to be used for the payment of expenses only if the assets are insufficient. *In re Brown's Will, supra.*

We have found no decisions of the Supreme Court of Florida dealing with the precise situation before us. However we are not convinced that tribunal would reach a result different from the one we reach. *Commissioner* v. *Estate of Bosch*, 387 U.S. 456, 465 (1967).[8] We are fortified in this conclusion by the case of *Johnson* v. *Burleson*, 61 So. 2d 170 (Fla. 1952), where the Supreme Court of Florida indicated in dicta that a life income beneficiary of a testamentary trust was entitled to income from the date of the testator's death. 61 So. 2d at 174. Also, it has long been the rule in Florida that an estate will vest at the earliest possible date unless the testator directs to the con-

---

[8] We are aware of cases such as *Henderson* v. *Chaires*, 35 Fla. 423, 17 So. 574 (1895) ; *Henderson* v. *Usher*, 125 Fla. 709, 170 So. 846 (1936) ; and *Murphy* v. *Murphy*, 125 Fla. 855, 170 So. 856 (1936), which indicate that the expenses of preserving an estate prior to distribution should be paid from income. These cases were decided before the enactment of Fla. Stat. Ann. secs. 733.01 and 734.05 (1967) (the latter specifically providing the sources for payment of charges against the estate), and are not relevant to the present question. *Ballantine* v. *Tomlinson*, 293 F. 2d 311 (C.A. 5, 1961) ; *In re Kent's Estate*, 23 Fla. Supp. 133 (County Judge's Ct. 1964).

trary. See *Story* v. *First National Bank & Trust Co., in Orlando*, 115 Fla. 436, 156 So. 101 (1934).

Our examination of Charles O. Miller's will and of Florida law leads us to the conclusion that Eva, as the life income beneficiary of the Share B Trust, was entitled to the net income earned on Share B assets during the administration of Charles O. Miller's estate which income under Fla. Stat. Ann. sec. 733.01(2)(c) and (3) (1967) was to be paid to the trustees, and distributed by them, as income.

Before turning to the question of Federal taxation raised by this case, we must take a moment to look separately at Share A of the husband's estate. Not all of Share A was distributed to Eva immediately, and the Florida estate portion of the Share A assets produced income prior to their being distributed. This income was part of the net income of the estate used to pay expenses.

The will designated no specific assets which should have been placed in Share A. Consequently, Share A is a general as opposed to a specific legacy. *In re McDougald's Estate*, 149 Fla. 468, 6 So. 2d 274 (1942). Fla. Stat. Ann. secs. 731.22 [9] and 733.01(2)(b) indicate that a general legatee will not participate in the income earned by an estate during administration unless otherwise directed by the testator.

Since there is no indication in the husband's will that the Share A bequest was anything but general and there is no direction that income should have been paid from the date of death, theoretically it could be that Eva, as legatee of Share A, was not entitled to any of the income earned on Share A assets prior to their being distributed. *In re McDougald's Estate, supra; In re Parker's Estate*, 110 So. 2d 498, 500 (Fla. App. 1959). However, this possibility does not necessarily follow in the instant case because Fla. Stat. Ann. sec. 733.01 (2)(c) (1967) provides that residuary legatees are to get all the net income of an estate not otherwise utilized under the terms of the statute. It will be recalled that Share A was not to be burdened with the payment of any expenses. Share A is stated as a percentage of the residue. Thus it may well be that Eva had a right to the income generated by the Share A assets in her status as a legatee of a defined portion of the residue. Under the Florida authority heretofore quoted this right would be as firmly vested as her right to the Share B income.

If Share A is a general legacy such that Eva had no right to the income earned by the assets comprising that share, then such income could be payable to the trustees of Share B under the provisions of Fla. Stat. Ann. sec. 733.01(2)(c) and (3). As we have seen the trustees

_____

[9] "The net income, interest or increase arising from property specifically devised or bequeathed shall belong to the specific legatees and devisees entitled thereto from the date of the death of the testator. From and after the time fixed by the county judge in an order of distribution, general legacies shall bear legal interest until paid."

would be obligated to distribute the income as such. Thus the distinction of whether Eva receives the income earned on Share A assets as the legatee of Share A or Share B is a matter of mathematical semantics because the result will be same in either event. Consequently Eva had the right to the net income earned by her husband's estate.

It can now be seen that the operative facts of this issue, for the purposes of the Federal estate tax, are not complex. Eva had a legal right to the net income. This income was used to pay the administrative and other expenses of the estate, although State law directed that the assets of the residue be so used, and the testator's will specifically confined this direction to the Share B assets. In a final accounting submitted to and approved by the Court of the County Judge, Eva specifically gave her approval and consent to a plan of distribution under which she would not get any of the accumulated income. The effect of all this was a transfer of the accumulated income to the corpus of the Share B Trust.[10] Since Eva had an unrestricted lifetime income interest in the trust, the value of the property transferred is includable in her gross estate. *Sexton* v. *United States*, 300 F. 2d 490, 493 (C.A. 7, 1962); *Estate of Anna Hart Kinney*, 39 T.C. 728, 731–732 (1963). That the transfer was to a trust not actually established by Eva is of no moment. A person who adds to a trust fund created by another can be treated as transferor of such portion. *Estate of Dora N. Marshall*, 51 T.C. 696, 701 (1969); *Estate of Charlotte D. M. Cardeza*, 5 T.C. 202, 218 (1945), affd. 173 F. 2d 19 (C.A. 3, 1949).

Petitioners rely on the case of *Brown* v. *Routzahn*, 63 F. 2d 914 (C.A. 6, 1933), to support their assertion that respondent cannot include in the gross estate a claim against another estate which the decedent failed to enforce. Petitioners' reliance on *Brown* v. *Routzahn* is misplaced. The decision in that case was based upon the premise that, under Ohio law, title and interest in property does not vest until it is accepted, and therefore a renunciation of a bequest prior to distribution was effective to keep the rejected bequest out of the would-be devisee's estate. See also *Estate of Mabel E. Morton*, 12 T.C. 380, 383 (1949); cf. H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 372, 494; sec. 20.2056(d)–1(a), Estate Tax Regs. To the extent that Eva can be held to have effected a disclaimer of the accumulated interest, such would constitute a transfer for purposes of the Federal estate tax. See *William L. Maxwell*, 17 T.C. 1589, 1592 (1952).

---

[10] A small portion of the accumulated net income was earned after the order approving the proposed final distribution. However no distributions were made according to the proposal prior to Eva's death. There is no evidence indicating that the income accumulated between the time the order approving Eva's final accounting and her death was treated differently than the income accumulated earlier. That is, it appears Eva also intended to add this income to the corpus of the trust.

The reliance of petitioners on *Estate of Leggett* v. *United States*, 418 F. 2d 1257 (C.A. 3, 1969), is similarly misplaced. That case concerned the application of Pennsylvania law to determine whether a decedent had a right to certain property, and if so whether the property was includable in the decedent's estate under section 2033.

Having determined that Eva effected a transfer to a trust with a retained life interest, we must decide the amount to be included in her estate on account of that transfer. The statute defines the amount to be included as the " 'value' of all property to the extent of any interest therein of which decedent has * * * made a transfer." Sec. 2036(a).

Consistent with the principle that income earned on assets used to pay expenses is properly an addition to the residue of an estate, respondent concedes that such income of the husband's estate should not be included in Eva's estate. *In re Brown's Will*, *supra* at 122–123. Absent clear evidence on the matter, we accept respondent's statement that the equivalent of 20.48 percent of the assets of the husband's estate should have been used for expenses. Consequently, the amount of net income attributable to Eva's right should reflect an adjustment in this amount.

Respondent propounds a formula to determine the amount to be included. Under this formula, one first determines the percentage of Eva's contribution by comparing the amount of net income due her with the Charles O. Miller estate probate value of the assets made available to the trust. The percentage thus resulting is to be applied to the trust assets valued as of the alternate valuation date selected by Eva's executors. The effect of this formula is to include in Eva's estate part of the accretion in value of the trust assets from the date of the husband's death.

Under the circumstances of this case we cannot accept respondent's formula. We hold, instead, that the proper portion of the trust of Share B includable in Eva's estate should be determined by taking that percentage of the total value of the trust as of the alternate valuation date as the dollar amount of income utilized to pay administration expenses of the estate of Charles O. Miller, which should have properly been paid out of principal assets, bears to the value of those assets as of the date of the approval of the final accounting of the estate of Charles O. Miller. Cf. *Estate of Dora N. Marshall*, 51 T.C. at 702–703.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

GOFFE, *J.*, concurring in part, dissenting in part: I concur with the majority of the Court as to the inclusion in the gross estate of Eva M. Miller of an unpaid bequest in the amount of $5,317.50 under the pro-

visions of section 2033. I dissent from the opinion of the majority insofar as it is concluded that there should be included in the gross estate of Eva M. Miller some amount by reason of the payment of expenses of administration out of the income of the estate of Charles O. Miller. With all due respect to my colleagues who ascribe to the majority opinion, I cannot help but characterize the opinion as wrong.

The majority includes in Eva's estate the sum of $79,869.85 under section 2036(a)(1). As best I can understand the opinion of the majority, such sum is includable because Eva had a vested right to the income generated by the assets forming the trust for her benefit under Charles O. Miller's will. Because she permitted that income to be used to pay expenses of administration rather than have such expenses paid from the assets comprising such trust, she somehow made a transfer to the trust in which she had a life estate. The majority also includes in Eva's estate some portion of the principal of the trust estate attributable to income receivable by the balance of the estate of Charles O. Miller (Share A) which was used to pay administration expenses on the proposition that such income became income of the trust.

I conclude that the majority is wrong for the following reasons: (1) Eva made no transfer during her lifetime; if a transfer were made it was after her death when no life estate existed; (2) even if a transfer did occur within the meaning of section 2036(a)(1) the property transferred, whatever it might be, was not owned by Eva; and (3) the income of the balance of the estate does not become trust income and its use cannot be the basis for taxing a part of the trust corpus in Eva's estate. My views are expressed in the order enumerated.

Section 2036(a)(1) requires that a transfer be made in some manner so that a life estate is retained. The majority apparently concludes that the required transfer occurred on May 10, 1965, when the Court of County Judge, Fla., approved the final accounting in Charles' estate. Eva died on February 9, 1966, prior to the final distribution to the Share B Trust from Charles' estate pursuant to the final accounting. An administrator was appointed for Charles' estate who distributed the estate in January 1967. I find it difficult to see how a transfer occurred when the final accounting was approved. The purpose of section 2036(a)(1) is to tax in the estate of a life beneficiary an interest which the life beneficiary is enjoying by reason of being a life beneficiary. Here, Eva enjoyed nothing. She died before the transfer was made. A different result might be reached under a dissimilar set of facts such as a case where there is a showing of an intent to avoid the effects of section 2036(a)(1) by intentionally delaying

a transfer. No such facts exist here. The transfer failed to take place by reason of the fortuitous death of Eva, the executrix of Charles' estate. When the transfer was effected, no life estate existed. Eva could not enjoy dividends on the corporate stocks until the stocks were transferred to the trust of which she was the life beneficiary.

I further conclude that Eva made no transfer because she owned nothing to transfer. I recognize that Eva was the lifetime beneficiary of the trust created by Charles' will, but do not agree with the majority that she had a right to the income from the assets finally comprising the assets of the trust during the course of administration of the estate.

The majority indulges in an interpretation of Charles O. Miller's will which I find erroneous. Without setting forth all of the reasons advanced by the majority for its conclusion I shall enumerate my reasons wherein I believe the majority went astray.

I concur with the majority that the primary guidance in construing a will is to determine the testator's intent and that should be done by making an examination of the entire instrument. I further concur that Charles' primary objective was to provide for his widow, Eva, and that he intended to take advantage of the estate tax marital deduction. I feel that the result of the majority opinion is contrary to the intent of Charles because it is contrary to the operation of a will which employs the use of the marital deduction coupled with a life estate in the surviving spouse.

The will of Charles O. Miller is an articulate, well-prepared instrument containing standard provisions designed to gain the maximum benefit of the estate tax marital deduction. A bequest to satisfy the requirements of the estate tax marital deduction together with a life estate in the remainder is a useful and widespread estate planning device. As any estate planner would explain under the facts of this case, the primary objective insofar as minimizing taxes is concerned, is to give to the surviving spouse the exact amount which will be deductible on the Federal estate tax return as the marital deduction and to give to the surviving spouse an interest in the remainder of the estate in such a manner that nothing will be taxable in her estate when she dies. This is often accomplished by means of a trust having the surviving spouse as life tenant and remainder unalterably to others, thus avoiding a second tax in the estate of the surviving spouse.

The holding of the majority thwarts the obvious intent of Charles O. Miller in the manner he wished his estate to be distributed.

The will expressly provided that the expenses of administration be paid out of Share B as defined in the will (the share going to form the

trust). I don't feel that this prohibits the executors from paying such expenses out of income generated by the assets of the estate during administration. The majority of the Court reaches the contrary result by finding that Eva had a vested right to the income of the trust. I cannot conclude this. The trust did not come into existence until the estate was distributed because it was created out of the residue of the estate as provided in paragraph Third of the will. The powers and duties of the trustees are immaterial during the administration of the estate. The majority comments that Charles O. Miller could have provided in his will that his executrix pay the expenses of administration out of the income of the estate. Such a provision would be folly. When a will is executed, a testator has no way of knowing what assets he may possess at death, what their value will be, or what income they will produce. Only his executor can best judge whether it is wiser to use cash income to pay expenses or to sell assets. In the usual situation if an estate produces adequate income to pay the expenses of administration the executor is delighted so he won't have to assume the responsibility for selling assets of the estate. I, therefore, strongly object to the conclusion of the majority that "We can safely assume that the testator, at the time he executed his will, anticipated that there would be an ample amount to fund the Share B Trust without using income earned during administration for the payment of expenses." Such a statement is no more than mere speculation and, I believe, an invalid assumption.

The majority finds that Eva's interest in the trust vested when Charles died but it was not funded until a later date. The assets comprising the trust could not even be identified until the estate was distributed.

Paragraphs (1) and (2) of Florida Statutes Annotated section 733.01 (1967) are as follows:

(1) The personal representative shall take possession of the personal property wheresoever situate of a person who hereafter dies a resident of the state, and shall take possession of the real estate (except homestead) within the state of such a deceased person, *and the rents, income, issues and profits therefrom whether accruing before or after the death of the decedent,* and of the proceeds arising from the sale, lease or mortgage of the same or any part thereof. * * *. *All such property and* the rents, *income,* issues and profits therefrom shall be assets in the hands of the personal representative for the payment of legacies, debts, family allowance, *estate and inheritance taxes, claims, charges and expenses of administration,* and to enforce contribution and to equalize advancement and for distribution.

(2) The net income earned by the assets of the estate after the death of the testator, and prior to the distribution of the estate, and *not used for the purposes set forth in subsection (1) above* shall in the absence of specific provision in the will to the contrary be paid and applied as follows:

[Emphasis added.]

From a cursory examination of the foregoing it is obvious that the Florida Statutes contemplate that during administration the income of the estate will be used to pay expenses of administration and any income not so used will go to the appropriate beneficiary, which is precisely what occurred here.

As a general rule, a residuary bequest of personal property subject to payment of the debts of the estate, does not vest in the beneficiary until administration of the estate has been completed. See *Estate of Francis S. Tilyou*, 56 T.C. 1362 (1971). However, under the laws of the State of Florida, the income of such a bequest during the period of administration vests in the beneficiary unless the testator provides otherwise. Fla. Stat. Ann. sec. 731.21 (1967).[1] In the case before us, the decedent's will specifically directed that "there shall first be payable any and all expenses of my estate" out of the testamentary trust which was designated "Share 'B'." A direction *first* to pay the expenses defers vesting until that condition, i.e., the payment of expenses, is met. *In re Estate of Horner*, 207 So. 2d 730 (Fla. App. 1968).

In *In re Estate of Horner*, *supra*, the will in question provided for a testamentary trust with instructions that quarterly payments of income to the beneficiary were to commence after payment of the expenses of administration. The beneficiary of the trust died during the period of administration. His widow brought suit on his behalf for the income which had accumulated during the period of administration. In denying her claim, the court said:

> At the time of Fred's death, Jed's executor had not yet made payment of the debts, expenses of administration, and estate taxes. Thus, the trust estate had not been funded or come into being at the time of Fred's death, and consequently, no payment of costs and expenses for the trust estate had been made either. Fred, therefore, was never entitled to a distribution of income. Parenthetically, no argument is made of any undue delay on the part of the executor in making payment of the debts, expenses of administration, or estate taxes.

> Had the decedent desired to provide otherwise in his estate, he could have provided that any income earned by the estate, or by the residuary trust estate, should be paid to his brother, Fred G. Horner, absolutely, or without any conditions attached thereto. This was the case of Johnson v. Burleson, Fla. 1952, 61 So. 2d 170, wherein the decedent provided that the executors should hold in trust the entire estate and pay the income to the decedent's wife exclusively, without let, hindrance or demand on the part of any persons whatsoever.

> \*      \*      \*      \*      \*      \*      \*

> Inasmuch as there was never any payment of debts, taxes, or administration of the estate, and there was never any payment of the costs or expenses of the

---

[1] Fla. Stat. Ann. sec. 731.21 (1967) provides:

The death of the testator is the event which vests the right to legacies or devises unless the testator in his will has provided that some other event must happen before a legacy or devise shall vest.

administration of the trust estate, there was never any "net income" from the residuary trust estate.

Nor are the findings by the majority of the testator's intent to favor his spouse in any way inconsistent with the applicability of this rule. On the contrary, to charge the spouse with income which was to pay the expenses of administration would be contrary to such intent.

Because Charles' will provided that the expenses of administration would be paid out of Share B and because I conclude that Charles did not intend to cause a vesting of the income from the Share B Trust in Eva during administration, I believe the following cases are distinguishable factually: *Risolia* v. *First National Bank of Miami*, 224 So. 2d 714 (Fla. App. 1969), certiorari denied 234 So. 2d 119 (Fla. 1969); *In re Will of Bowen*, 240 So. 2d 318 (Fla. App. 1970); *In re Merrill's Will*, 11 Fla. Supp. 48 (County Judge's Ct. 1957); *In re Kent's Estate*, 23 Fla. Supp. 133 (County Judge's Ct. 1964).

The majority also includes in Eva's estate some portion of the trust estate attributable to the income generated by Share A and used to pay the expenses of administration of Charles' estate.

The majority first seems to say that *if* the bequest of Share A to Eva is a general bequest then Eva had a right to it as a residuary legatee. This is contrary to Fla. Stat. Ann. sec. 733.01(2)(b), quoted above, which gives to general legatees legal interest on their respective legacies as fixed by the county judge.

The majority then hypothetically observes that if she had no such right to the income then the income would be payable to the trustees of the Share B Trust to be distributed by the trustees as income and to the extent used to pay administration expenses it would be taxable in Eva's estate. I fail to see how such income from Share A becomes Share B. Such income instead becomes part of the residue of the estate and can be used to pay expenses of administration. Charles' will did not prohibit income generated by Share A to be used for payment of administration expenses. His will only prohibited Share A itself from being used. This is for the obvious reason that payment of such expenses *from Share A* would reduce the marital deduction but payment of such expenses *from the income of Share A* has no effect on the amount of the marital deductions.

The majority, because it found the "transfer" includable in Eva's estate under the provisions of section 2036(a)(1) found it unnecessary to consider respondent's alternative arguments under sections 2036(a)(2) and 2038. The reasons set forth above for not including the "transfer" under section 2036(a)(1) apply with equal force to sections 2036(a)(2) and 2038. My conclusion is that the payment of the expenses of administration out of any portion of the income of the estate

of Charles O. Miller cannot result in inclusion in the Estate of Eva Miller, deceased, of any portion of the corpus of Trust B established under the will of Charles O. Miller.

DRENNEN, HOYT, and QUEALY, *JJ.*, agree with this opinion.